UNITED STATES of America, Plaintiff,

v.

SYUFY ENTERPRISES and Raymond J. Syufy, Defendants.

No. C–86–3057 WHO.

United States District Court,
N.D. California.

Feb. 3, 1989.

---

Bernard M. Hollander, Richard S. Nicholson, Marc W.F. Galonsky, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., Gary R. Spratling, Antitrust Div., U.S. Dept. of Justice, San Francisco, Cal., for plaintiff.

Maxwell M. Blecher, Beverly S. Tillett, Los Angeles, Cal., for defendants.

## OPINION

ORRICK, District Judge.

In a major effort to force the contemporary relevant product market in the motion picture industry—consisting of first-run exhibits, sub-run exhibits, and exhibits on home video, cable television, and pay-per-view television—into the procrustean strictures of the relevant product market—consisting solely of first-run exhibits—established forty years ago in the legendary *Paramount* case,[1] the United States has brought suit against defendants, Syufy Enterprises and Raymond Syufy (hereinafter collectively "Syufy"), charging Syufy with monopolizing and attempting to monopolize under Section 2 of the Sherman Act, 15 U.S.C. § 2, and of substantially lessening competition under Section 7 of the Clayton Act. 15 U.S.C. § 18.

Finding that the government has given little, if any, consideration to the vast and rapid technological changes in the industry that have resulted in substantial nontheatrical exhibits and is relying by default on first-run exhibits as the relevant product market, the Court, after an eight-day trial, finds for Syufy on the claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act. The Court, therefore, denies the government's request for a mandatory injunction that would require Syufy to divest its Red Rock Theatre and either the Parkway Theatre or the Boulevard Theatre.

### I.

#### A. *Jurisdiction*

1. The government brought this action against Syufy alleging violations of Section 2 of the Sherman Act and Section 7 of the Clayton Act. The Court has jurisdiction over this case under Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 15 of the Clayton Act. 15 U.S.C. § 25.

2. The product market in this case involves a continuous and uninterrupted stream of interstate commerce, and the alleged activities of Syufy are within the

---

1. *United States v. Paramount Pictures, Inc.,* 334    U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

flow of, and substantially affect, interstate commerce.

3. Syufy is a limited partnership of which Raymond J. Syufy is the general partner, with its principal place of business in San Francisco, California.

4. Syufy is a regional motion picture theatre circuit that, in 1985, operated a total of thirty-three indoor theatres with approximately one hundred thirty screens, and twenty-three drive-in theatres with approximately one hundred eight screens, in California, Nevada, and several other western states.

### B. *The Industry*

5. The motion picture industry in broad terms encompasses three activities: production, distribution, and exhibition. Producers create motion pictures and either enter into agreements with distributors to have their films distributed for exhibition or, in some cases, independently distribute their own motion pictures. Some distributors also produce their own motion pictures or, in other instances, finance the work of independent producers.

6. Motion pictures are generally distributed in the following sequence: initially, they are licensed to exhibitors for public theatrical exhibition; thereafter, they are sold in videocassette form for resale or rental for private, "home video" use. They are also licensed for exhibition on cable and broadcast television. Motion pictures are just beginning to be licensed for pay-per-view television.[2] The time between the date on which the distributor first releases the film to theatres and any subsequent release to theatres or release to videocassette and cable television is known in the motion picture industry as a "window." The once rigid windows are becoming blurred because the release times vary greatly. Except for the extremely successful films, the windows are shorter than they were once.

7. The licensing of motion pictures by distributors to exhibitors includes the following procedures: licenses are awarded after exhibitors submit offers in response to competitive bid solicitations, or after direct negotiations between exhibitors and distributors, or after distributors have selected exhibitors, without either soliciting bids or negotiating.

8. Film licenses usually specify, among other things, terms requiring the payment to the distributor by the exhibitor of a percentage of the weekly gross or net box office receipts, specific playdates, and length of play time (including the conditions under which the film will be held over beyond the specified playdates). Licenses may also include a guarantee, which is a minimum fee payable in advance to the distributor regardless of the box office success of the film, or an advance, which is an advance payment to be applied against the film rental ultimately owed by the exhibitor to the distributor under the terms of the license.

9. A "busted guarantee" or "busted bid" in industry terms is the situation when at the end of the film's exhibition, the percentage of gross box office receipts payable to the distributor is less than the amount paid in the guarantee.

10. Distributors, in determining which theatre would maximize its revenues from first-run exhibition, consider, among other things, the terms offered, the seating capacity, quality, location, and management, as well as the guarantees, advances and the admission price structure of the theatres.

11. These considerations are much more important when exhibition is limited to exclusive runs. Where, however, there is simultaneous exhibition at more than one theatre in the same geographic area (day-and-date), then the factors outlined are of reduced significance in the selection process. There is, therefore, a distinction between characterizing a theatre as first-run in an exclusive run context as compared with characterizing a theatre as first-run in a day-and-date context.

---

2. Pay-per-view television is the term used for the service providing newly released motion pictures to cable television viewers for a fee for every motion picture ordered. This service is just beginning to be utilized by the distributors.

Moreover, distributors' opinions as to the first-run nature of a theatre are not unanimous and will vary depending upon the nature of the picture and the competitive situation existing at the time of its release. Therefore, in determining what is a first-run theatre, one must consider the particular distributor, the nature of the picture, the anticipated time of its release and, above all, whether the distributor is looking at an exclusive as opposed to a multi-run exhibition.

### C. *The Relevant Market*

12. First-run exhibition of motion pictures has frequently been recognized in motion picture cases as the relevant product market. This definition, however, fails to take into account the rapid and vast changes in technology and economics in the motion picture industry that now warrant a broader product market definition. The Court finds that the contemporary product market in this case is first-run exhibits of motion pictures, sub-run exhibits of motion pictures, and exhibition on home video, cable television, and pay-per-view television.[3] (A detailed analysis of how the Court arrived at this definition can be found in Section II, *infra*, of this Opinion.)

13. The parties stipulated that exhibition at drive-in theatres was a separate product market.

14. The local area in and around Las Vegas, Nevada, is the relevant geographic market in this case.

### D. *Entertainment in Las Vegas*

1. December 1980 to October 1984

15. In December 1980, there were three exhibitors regularly engaged in first-run exhibition in Las Vegas: Plitt Theatres, Inc. ("Plitt"), a major exhibition circuit, operated the Parkway Theatre (three indoor screens, 1,424 total seats); Mann Theatres Corporation of California ("Mann"), a major exhibition circuit, operated the Fox Charleston Theatre (one indoor screen, 846 total seats) and the Boulevard Theatre (two indoor screens, 846 total seats); and Cragin

Industries ("Cragin"), an independent exhibitor, operated the Red Rock Theatre (eleven indoor screens, 3,446 total seats).

16. Prior to 1981, Syufy only operated two drive-in theatres in Las Vegas.

17. In about January 1981, Syufy opened the Cinedome Theatre (six indoor screens, 2,499 total seats), which thereafter engaged in both first-run and sub-run exhibition.

18. As of January, 1981, Plitt, Mann, Cragin, and Syufy regularly competed for both first-run and sub-run exhibition in Las Vegas.

19. From February 1982 through mid-October 1984, Roberts Co., Inc. ("Roberts") operated the Mountain View Theatre (three screens, 900 total seats) and the Huntridge Theatre (two screens, 600 total seats). Katz, an independent exhibitor, operated a theatre in downtown Las Vegas.

20. Roberts and Katz primarily competed for sub-run exhibition and occasionally competed for first-run exhibition of motion pictures in Las Vegas.

21. From January 1981 through mid-October 1984, the exhibitors competing in first-run exhibition in Las Vegas engaged in extremely intense bidding competition for first-run motion picture licenses, which resulted in the payment to distributors of higher guarantees, and higher film rental, than were generally paid, on average, by exhibitors elsewhere.

22. On December 6, 1982, Syufy acquired from Plitt the lease to operate the three-screen Parkway Theatre.

23. Syufy acquired Plitt's theatre for efficiency reasons after Plitt decided to exit Las Vegas for independent business reasons.

24. One effect of Syufy's acquisition of Plitt's theatre was a slight lessening of the level of guarantees bid by exhibitors in Las Vegas in connection with blind bid motion pictures. Many of those bids became bust-

---

**3.** The industry uses the term "ancillary markets" to describe the distribution of motion pictures to home video, cable television, and pay-per-

view television. The Court will occasionally use that term as well.

ed guarantees, which is defined in paragraph 9 above.

25. On February 7, 1983, Syufy acquired from Mann the leases to operate the Fox Charleston and the Boulevard Theatres.

26. Syufy acquired Mann's theatres for efficiency reasons after Mann decided to exit Las Vegas for independent business reasons.

27. One effect of Syufy's acquisition of Mann's theatres was a slight lessening of the level of guarantees bid by exhibitors in Las Vegas in connection with blind bid motion pictures. Many of those bids became busted guarantees.

28. There was no evidence of any predatory action by Syufy in the acquisition of either the Plitt or Mann theatres.

### 2. Syufy's Acquisition of the Red Rock Theatre

29. Syufy became interested in acquiring the Red Rock Theatre in the fall of 1983 when Syufy learned that Cragin was interested in selling. Several factors were weighed by Syufy in deciding to purchase the Red Rock Theatre in lieu of constructing new screens in conjunction with Syufy's existing theatres, including the value of the land on which the theatre was situated and the cost-savings to Syufy in terms of building expenses. Syufy also believed that it would be in its best interest to acquire the Red Rock Theatre in order to limit the extent of unearned guarantees previously bid by exhibitors in Las Vegas on blind bid motion pictures that resulted in super-competitive film rentals in Las Vegas, well above national coverages being paid to distributors. Other exhibitors in Las Vegas at times referred to this competition in Las Vegas as a "bloodbath."

30. Given the lack of any entry barriers, Syufy believed that any reduction of the bidding "bloodbath" in Las Vegas resulting from its acquisition of the Red Rock Theatre would be short-lived and temporary. Syufy also believed that reduced film rental would encourage expansion and entry in Las Vegas. This is in fact what occurred.

31. Beginning late in the summer or early in the fall of 1983, Horst Schmidt, one of two partners in Cragin, and representatives of Syufy met several times to discuss the possible sale of the Red Rock Theatre to Syufy. On December 22, 1983, Jerome L. Blut, a lawyer for Cragin, toured representatives of Syufy through the Red Rock Theatre. Schmidt orally agreed to sell the Red Rock Theatre to Syufy and the agreements were drafted. On the basis of these facts, Syufy's counsel, after research, concluded that there was a reasonable argument for enforceability of the agreement to sell the Red Rock Theatre. The Court does not find that the contract was enforceable, but only that Syufy's counsel believed that there was an argument for enforceability and passed that information on to Syufy.

32. Upon learning in February 1984, that Schmidt of Cragin was negotiating with Festival Enterprises ("Festival"), another exhibition circuit, regarding sale of the Red Rock Theatre, Syufy's counsel, upon Syufy's instructions but after legal research, asserted to Cragin's representatives Syufy's position that it had an earlier commitment to purchase the theatre that it believed was enforceable. Cragin denied that a binding agreement to sell to Syufy had been reached. Syufy disagreed, and on February 1, 1984, Jack Myhill, Syufy's general manager, wrote to Festival to put it on notice that Syufy claimed a right to purchase the Red Rock Theatre based upon what it believed to be an enforceable commitment from Schmidt. Pl.Exh. 18.

33. Notwithstanding notice of Syufy's claim, Festival left pending its offer submitted on February 1, 1984, that specified that it would remain open to and including March 16, 1984, and if not accepted by that date, would be deemed withdrawn. Lucille Cragin, at the time a 51 percent partner in Cragin Industries, declined to accept the Festival offer.

34. On May 4, 1984, Lucille Cragin filed in state court a complaint against Schmidt, at that time a 40 percent partner of Cragin, seeking, among other things, a dissolution of the partnership. The Red Rock Theatre was the principal asset of the partnership.

35. On May 15, 1984 (more than three months after receiving Myhill's letter claiming Schmidt had agreed to sell the Red Rock to Syufy), Festival renewed its offer to purchase the Red Rock Theatre. Schmidt immediately filed a countermotion in the partnership dissolution action requesting an order directing the sale of the theatre to Festival, with a letter appended setting forth Festival's offer to purchase the Red Rock Theatre. The state court declined to schedule a hearing on Schmidt's counter-motion and never took any action relative to that counter-motion. Festival's offer expired by its terms on May 31, 1984. In approximately the summer of 1984, Festival advised Schmidt that it was no longer in a position to negotiate for the purchase of the Red Rock Theatre inasmuch as it had recently expended its available funds to acquire additional theatres in northern Nevada.

36. In January 1984, when it became clear that Schmidt was reneging on his earlier oral agreement to sell the Red Rock Theatre to Syufy, Syufy announced the planned construction of four additional 500–seat screens at the Cinedome Theatre and two new 500–seat screens at the Boulevard Theatre in Las Vegas. In about September 1984, Syufy applied to the Las Vegas Planning Department for permission to add four additional 500–seat screens at the Cinedome and submitted its master plan.

37. In September 1984, four months after Schmidt had failed to end his partnership dispute with Lucille Cragin by his motion for court-ordered sale of the Red Rock Theatre to Festival, negotiations commenced in earnest between Syufy and Cragin relative to the sale of the Red Rock Theatre. Syufy saw a need for additional screens in Las Vegas and did not use the "new" screens as a "club" against Schmidt. Had Schmidt not sold, or sold to someone other than Syufy, the "new" screens would have been built by Syufy. In October 1984, however, Schmidt agreed, for the second time, to sell the Red Rock Theatre to Syufy. In response, Syufy decided not to go forward with new screen construction.

38. During the negotiations between Syufy and Cragin for the sale of the Red Rock Theatre, Joseph Alioto, an antitrust attorney who formerly represented Syufy, called Monte Stewart, Schmidt's attorney. Alioto urged that the deal be closed quickly because it was easier to fight the Antitrust Division of the Justice Department after a sale than before. It was not shown that this comment was taken seriously. In fact, given the history of the negotiations between the parties, the comment likely was conveyed simply to expedite the deal.

39. Syufy acquired the Red Rock Theatre from Cragin on October 16, 1984. Included in the sales agreement whereby Syufy acquired the Red Rock Theatre was a general release by Cragin and its partners of any claims against Syufy, and a specific release of any claims under the Sherman Act, relating to the ownership, operation, and sale of the Red Rock Theatre. This provision, however, was not shown to be unique to this contract or in any way evidence of concern on Syufy's part with possible antitrust consequences of the acquisition.

40. Concurrently with its acquisition of the Red Rock Theatre on October 16, 1984, Syufy paid $25,000 to Schmidt of Cragin for Schmidt's agreement not to acquire any interest in a motion picture theatre or to compete in motion picture exhibition in Clark County, Nevada, for so long as Syufy is engaged in such business at the Red Rock Theatre, for a maximum of ten years. This agreement was not shown to be unique and, in fact, is relatively common in this type of transaction. No inference of an intent to monopolize on Syufy's part can be drawn from this agreement.

41. The Red Rock Theatre at the time of its sale was not a failing business.

42. From January 1983 through the date of the Red Rock Theatre acquisition, Syufy's theatres accounted for 59.9 percent and Cragin's Red Rock Theatre accounted for 40.1 percent of the first-run motion pictures exhibited in Las Vegas.

43. Likewise, in 1985, when Roberts was a small competitor, Syufy played 91 percent of the first-run pictures and Rob-

erts played 9 percent. In 1986, Syufy played 85 percent of the first-run motion pictures and Roberts played 15 percent. As competition increased between Syufy and Roberts in the first half of 1987, Syufy played 79 percent of the first-run movies and Roberts played 21 percent. In the second half of 1987, Syufy played only 57 percent of the first-run movies and Roberts/United Artists [4] played 24 percent of the first-run movies. Roberts/United Artists and Syufy played 19 percent of the first-run movies as day-and-date between them. In the first four months of 1988, Syufy played 39 percent of the first-run movies exclusively. United Artists played 25 percent of the movies exclusively. Syufy and United Artists played 36 percent of the movies on a day-and-date basis between the two of them. Strong competition existed and exists between the exhibitors in Las Vegas.

44. From January 1983, through the date of the Red Rock Theatre acquisition, Syufy's theatres accounted for 66.5 percent and Cragin's Red Rock Theatre accounted for 33.5 percent of the gross box office revenues generated in first-run exhibition in Las Vegas.

45. In 1985, Roberts accounted for 6.87 percent of the total box office gross in Las Vegas. In 1986, that figure rose to 10.41 percent. In 1987, after building new theatres, Roberts/United Artists had 22.13 percent of the box office gross receipts. In the first three months of 1988, United Artists had approximately 25 percent of the gross box office receipts.

46. There has never been a dangerous probability that Syufy would monopolize the Las Vegas market for exhibition of motion pictures in that Syufy lacks the power to control prices or exclude competition with respect to the exhibition of motion pictures in Las Vegas. This is true regardless of whether the market is defined as the Court does in paragraph 12 or if it is limited to first-run exhibits, the product market definition proposed by the government.

47. Syufy's acquisition of the Red Rock Theatre could not substantially lessen competition or create a monopoly in Las Vegas because Syufy lacks the power to control prices or exclude competition with respect to the exhibition of motion pictures in Las Vegas.

3. 1982–1984 Sub–Run Exhibition

48. From February 1982 through mid-October 1984, Roberts operated only the Mountain View and Huntridge Theatres. *See* ¶ 19, *supra.*

49. Distributors have not viewed generally the Mountain View and Huntridge Theatres as first-run because of their size, location, and quality.

50. An additional triplex theatre has been operated in downtown Las Vegas by an exhibitor named Blair (who acquired the theatre from Katz). This theatre has not regularly engaged in first-run exhibition during the time period relevant to this suit. *See* ¶ 19, *supra.*

4. First–Run Exhibition After
Acquisition By Syufy of the
Red Rock Theatre

51. The six screens that Syufy constructed as the Cinedome Theatre are considered to be the superior screens in Las Vegas. The other screens that Syufy acquired are also very good grossing theatres in Las Vegas and, thus, some of the best for first-run exhibition in Las Vegas. Many of Roberts/United Artists's screens are considered good grossing screens and with some physical improvements might be considered even better.

52. A variety of factors, many of which are totally unconnected with Syufy's acquisition of the Red Rock Theatre, affected terms paid to distributors in 1985–87 as compared with 1983 and 1984. Among them are (1) the quality of films released plunged in 1985; (2) blind bidding, which

---

**4.** Roberts' theatres were sold to United Artists Theatre Circuit, Inc. ("United Artists") in August 1987. Throughout this Opinion, Roberts and United Artists will be referred to separately for the time periods discussed that do not overlap the two entities' ownership and will be referred to together (i.e., "Roberts/United Artists") for those time periods being discussed in which ownership overlaps.

tended to produce inflated guarantees, was substantially curtailed by distributors on a national basis; and (3) many distributors determined, as a matter of national policy, to negotiate with exhibitors for motion picture licenses rather than to solicit competitive bids. The negotiation process, whereby distributors choose the theatre in which they wish to place their film and set the terms they offer to exhibitors, has resulted generally, in fewer and lower guarantees and rental terms more consistent with a national policy set for each film.

53. Distributors of motion pictures have had and continue to have viable alternatives to dealing with Syufy in Las Vegas. Since the date of Syufy's acquisition of the Red Rock Theatre, distributors have dealt with Roberts and its successor, United Artists. In addition, distributors have a wide variety of substitute distribution outlets for motion pictures in Las Vegas, including distribution through home video, cable television, and pay-per-view television. As an indication of this, Las Vegas is the highest grossing market for motion picture videocassettes in the nation.

54. In late October 1984, Syufy and Orion Pictures Distribution Corporation ("Orion"), a distributor of motion pictures, had a contract dispute over the license agreement for the film "The Cotton Club" in Las Vegas and other markets. Because of this contract dispute, Orion chose to exhibit that film in Las Vegas at the Mountain View and Huntridge Theatres, owned by Roberts. Since that time, Orion has chosen to exhibit all its motion pictures at non-Syufy theatres in Las Vegas as in every other market where Syufy operates.

55. Orion chose to exhibit its motion pictures at non-Syufy theatres as a matter of policy. No evidence, however, was introduced that indicated Orion did not consider Roberts a viable, if not perfect, substitute to exhibiting its pictures at Syufy theatres.

56. Until November 1985, Roberts continued to operate only the Mountain View and Huntridge Theatres. In November 1985, Roberts opened the Paradise Theatre (six screens, 1,585 total seats) in Las Ve-

gas. In July 1986, Roberts opened the Cinema 8 Theatre (eight screens, 1,739 total seats) in Las Vegas. In December 1986, Roberts opened the Sunrise 7 Theatre (seven screens, 1,734 total seats) in Las Vegas. The same month, it also began to book and operate the Gold Coast Cinema (two screens, 416 total seats), which is located inside the Gold Coast Casino in Las Vegas.

57. Roberts was a successful competitor of Syufy in Las Vegas. Its expansion from five to twenty-eight screens, strategically located, induced distributors to license multiple, as opposed to exclusive runs, and Roberts was able to increase its market share and sell out at a substantial profit to United Artists.

58. From November 1985 until the sale of the chain in August 1987 to United Artists, Roberts competed for and licensed first-run releases from distributors. At least those distributors that licensed motion pictures to Roberts must have believed that Roberts' theatres were superior to Syufy's for exhibiting the films licensed to Roberts.

59. United Artists, which now owns Roberts' theatres in Las Vegas, has licensed and continues to license first-run releases in Las Vegas. It is implicit from these licenses that distributors consider United Artists's theatres superior for the motion pictures licensed to those theatres.

60. Distributors have licensed and continue to license first-run releases to Roberts' (and now United Artists') Huntridge, Mountain View, and Cinema 8 Theatres, and each distributor has solicited competitive bids for first-run releases from those theatres.

61. Gold Coast Cinema, now operated by United Artists, has licensed and continues to license first-run releases from numerous distributors.

62. Paradise Theatre, now operated by United Artists, has licensed and continues to license first-run releases from numerous distributors.

63. Sunrise Theatre, now operated by United Artists, has licensed and continues

to license first-run releases from numerous distributors.

64. In August 1987, United Artists replaced Roberts in Las Vegas by acquiring the Roberts chain.

65. United Artists also acquired all the theatres owned by Blair Theatres, including a triplex located in downtown Las Vegas. After the acquisition, United Artists operated thirty-one screens in Las Vegas as opposed to Syufy's twenty-three screens. Syufy recently closed the Fox Charleston Theatre, leaving Syufy with only twenty-two screens. Syufy is planning to open twelve new screens shortly after the trial in this case, which would put its total number of screens at thirty-four.

66. According to the acquisition agreement between Roberts and United Artists, United Artists paid $3.75 million for Roberts' theatres, a price within the normal range of prices it pays for theatres.

67. United Artists purchased Roberts' theatres to use them as first-run theatres, even though it believed it could make a normal rate of investment if it used them as sub-run theatres.

68. United Artists has unilaterally declined to compete on occasion with Syufy in Las Vegas, notwithstanding its resources. In addition, United Artists believes that if it is given good pictures by the distributors, then its theatres will become high grossing theatres. United Artists should instead first create theatres with a high grossing potential and, based on that, be awarded good pictures.

69. United Artists possesses the resources to alter the Roberts theatres it acquired as it deems fit.

70. United Artists has been successful in licensing many first-run releases in Las Vegas and is much more successful than was Roberts because of its substantial "clout" with distributors.

71. Las Vegas is a competitive market for the distribution of motion pictures. Notwithstanding United Artists' belief that it cannot compete with Syufy, with respect to theatrical exhibition, United Artists, the largest exhibitor in the country, competes vigorously with Syufy, a substantially smaller chain.

72. During the eleven months after Roberts started operating the Gold Coast Cinema (December 12, 1986–November 6, 1987), Roberts/United Artists theatres licensed 28.3 percent of the first-run films and accounted for 23 percent of the gross box office receipts generated by the exhibition of first-run motion pictures in Las Vegas; Syufy's theatres licensed the remaining 71.7 percent of first-run films and accounted for 77 percent of gross box office receipts.

73. During 1987, Roberts/United Artists' theatres licensed many first-run releases from distributors. Some were licensed on an exclusive basis, while most were licensed on a day-and-date basis either among United Artists' theatres or with Syufy.

74. During the first eight months of 1988, United Artists' theatres licensed many first-run releases from distributors. Some were licensed on an exclusive basis, while most were licensed on a day-and-date basis either among United Artists' theatres or with Syufy.

75. Since October 1984, there has been competition between exhibitors in Las Vegas for both first-run and sub-run exhibition. The bidding competition for first-run film licenses between exhibitors in Las Vegas immediately after the acquisition of the Red Rock Theatre by Syufy decreased from the level it was at before the acquisition. The level of competition was extremely intense before the acquisition and returned to a more normal level of competition after the acquisition. Distributors testified, and the Court finds, that the preacquisition level of competition was unhealthy and could not permanently continue.

76. Distributors have collected what they consider to be fair and reasonable film rentals with respect to the license of motion pictures for exhibition in Las Vegas. The percentage of film rentals paid in Las Vegas is consistent with film rentals paid nationally on a film-by-film basis.

77. Immediately after the Red Rock Theatre acquisition, the percentage of gross box office receipts Syufy paid to exhibitors decreased slightly from what it was prior to the acquisition. This can be attributed to the decrease in "busted guarantees" in Las Vegas, the decrease in bidding in general by the movie distributors, and the natural stabilization of a dynamic market in Las Vegas.

78. In 1987 and 1988, Syufy paid a similar or higher film rental as a percentage of gross as it did prior to the acquisition of the Red Rock Theatre. This is overwhelming evidence that the market in Las Vegas is competitive.

79. Further, at all times after Syufy's acquisition of the Red Rock Theatre, Syufy paid a higher percentage of gross receipts to the distributors than was paid on the national average. Indeed, in 1987 and 1988, Syufy paid more in terms of percentage than it did during the very intense level of competition that existed prior to the acquisition.

80. Distributors determine whether they wish to distribute a film on a day-and-date or exclusive run basis. Until mid-1987, distributors offered this choice to the exhibitors. Syufy choose to license most pictures on an exclusive basis because it was in its best interest. As the population of Las Vegas grew and the number of theatres expanded, distributors determined that day-and-date distribution of certain films in Las Vegas might increase their returns. No distributor has complained that it was forced to exhibit any film on an exclusive basis by reason of any conduct on the part of Syufy. Since mid-1987, more films have been exhibited in Las Vegas on a day-and-date basis than on an exclusive basis.

81. Syufy does not possess the power to control prices or exclude competition in the relevant product market of first-run exhibition, sub-run exhibition, and distribution to the ancillary markets. If the Court were to take first-run film licenses in Las Vegas alone as the relevant market, it would find that Syufy also does not have the power to control prices or exclude competition.

82. Syufy did not willfully acquire or maintain monopoly power in Las Vegas.

83. Syufy does not have the specific intent to control prices or destroy competition with respect to a part of commerce.

84. Syufy did not conduct itself in a predatory or anticompetitive fashion directed to controlling prices or destroying competition.

85. There is no dangerous probability that Syufy will monopolize exhibition of motion pictures in Las Vegas either in the relevant market defined by the Court in paragraph 12, *supra*, or the outdated market the government proposed.

86. Syufy's acquisition of the Red Rock Theatre did not create a substantial likelihood of lessening competition in Las Vegas either in the relevant product market defined by the Court in paragraph 12, *supra*, or the outdated market proposed by the government.

### 5. Ease of Entry Into First-Run Exhibition Market

87. Syufy and John Enea had a brief conversation at the Show West Convention in Las Vegas in 1985. That conversation consisted primarily of a discussion about Daniel Tocchini's possible plans to construct a motion picture theatre in Las Vegas. It is unclear what was said between the two men, but it is clear that Tocchini's plans to build the Cinema 8 theatres in Las Vegas were not thwarted in any way by what was said during the conversation referred to above.

88. Overcapacity is not a recognizable entry barrier to the Las Vegas exhibition market where the population continues to grow at a rapid pace and vast areas of developable land remain available to the potential entrant.

89. An industry rule of thumb is that an area can support one theatre for every ten thousand persons.

90. Although exhibitors throughout the country have taken advantage of the efficiencies associated with operation of multiple-screen theatres, it is possible, depending on many factors, that an entrant with a

smaller number of screens could effectively compete in Las Vegas.

91. There is no evidence to support the government's claim that the building of a combination of multiple-screen theatres in Las Vegas would exacerbate overcapacity. The more likely result of such entry would be the exit of some of the less attractive and less efficient theatres in Las Vegas.

92. Syufy has the reputation of being an aggressive, efficient, and superior owner and operator of motion picture theatres.

93. Syufy's reputation did not deter Festival from offering to purchase the Red Rock Theatre.

94. Likewise, the best example of no entry barriers in Las Vegas is Roberts' entry and rapid expansion. Roberts, an inexperienced theatre owner, expanded from five to twenty-eight screens in a very short time frame. *See* ¶ 19, *supra.* Roberts could have built deluxe, luxury theatres but instead built what was described by Robert Garganese, Roberts' owner, as "functional." R.T. Vol. 2, 301:19. Finally, there were no entry barriers to United Artists from entering the Las Vegas market by acquiring Roberts.

95. In February, 1988, Mann concluded a study of the Las Vegas first-run exhibition market.

96. Mann determined not to enter the Las Vegas market at this time citing as a major factor that film rentals would be very high, perhaps as high as they were when Mann exited the market in the early 1980's.

97. United Artists entered Las Vegas in August 1987. Given the continued growth of population in Las Vegas and the lack of entry barriers, potential further growth in the number of screens remains probable.

### 6. Syufy Expansion

98. Syufy is currently constructing and planning to open a twelve-screen (4,192 seats) theatre on the east side of Las Vegas.

99. There is no evidence to support the government's claim that Syufy's opening of a new twelve-screen theatre in Las Vegas will give Syufy the power to control prices or exclude competition in Las Vegas.

100. Competition exists today between United Artists, Syufy, and alternative outlets for the distribution of motion pictures in Las Vegas and there is no basis for the Court to interfere with the competitive process now at work.

## II.

### A. *The Relevant Market*

Determining the relevant market is the threshold question in analyzing whether there has been a violation of Section 2 of the Sherman Act or Section 7 of the Clayton Act.[5] *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). The relevant market is generally the same for cases brought under either Section 2 of the Sherman Act or Section 7 of the Clayton Act. *United States v. Grinnell Corp.,* 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966). The relevant market is a factual question. *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 994 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

The relevant market inquiry is divided into two parts—the relevant geographic market and the relevant product market. *Case–Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 454 (9th Cir.1966), *cert. denied,* 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994 (1967). The parties have stipu-

---

5. The importance of defining the relevant market was underscored by Justice Fortas of the Supreme Court in his dissenting opinion in *United States v. Grinnell Corp.,* 384 U.S. 563, 587, 86 S.Ct. 1698, 1712, 16 L.Ed.2d 778 (1966), in which he stated:

[T]he search for "the relevant market" must be undertaken and pursued with relentless clarity. It is, in essence, an economic task put to the uses of the law. Unless this task is done well, the results will be distorted in terms of the conclusion as to whether the law has been violated and what the decree should contain.

*Id.* at 587, 86 S.Ct. at 1712.

lated that Las Vegas, Nevada, is the relevant geographic market. Plaintiff's Proposed Findings of Fact and Conclusions of Law (hereinafter cited as "Pl. Findings"), filed Sept. 30, 1988, No. 15, at 5; Defendants' Proposed Counterfindings of Fact and Conclusions of Law (hereinafter cited as "Def. Counterfindings"), filed Oct. 11, 1988, No. 15 at 4. Thus, this case focuses on the scope of the relevant product market. The government contends that the relevant product market should include only first-run exhibits of motion pictures. Pl. Findings, No. 12, at 4–5. Syufy contends that the rapid development of technology warrants an expansion of the product market beyond first-run exhibits to include sub-run exhibits as well as exhibition in the ancillary markets of home video, cable television, and pay-per-view television. Def. Counterfindings No. 12 at 3.

The relevant product market in a motion picture case was first defined in the famous case of *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 170–71, 68 S.Ct. 915, 935, 92 L.Ed. 1260 (1948). In that case, decided forty years ago, the Supreme Court defined the relevant product market as first-run exhibition of motion pictures. That definition has been routinely accepted ever since by courts dealing with motion picture cases. *See, e.g., Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225, 1229–30 (3d Cir.1988); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 437 F.Supp. 1268, 1299 (D.Neb.1977), *aff'd*, 585 F.2d 877 (8th Cir.1978).

The advent of vast and rapid technological changes in the industry resulting in substantial nontheatrical exhibition requires the Court to reassess the validity of limiting the product market to first-run exhibits. See McCoy, *The Paramount Cases: Golden Anniversary in a Rapidly Changing Marketplace*, ANTITRUST, Summer 1988, for an excellent analysis of the *Paramount* cases and the need for reassessing the decisions made in resolving those disputes.

The purpose of defining a relevant product market is to assess the boundaries of the market in which the defendants' alleged monopoly power is appraised. *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961). The courts have primarily used the test of cross elasticity of demand to determine the relevant product market. *E.I. du Pont*, 351 U.S. at 393–95, 76 S.Ct. at 1006–08. *See also* Von Kalinowski, 3 *Antitrust Laws and Trade Regulation*, at § 8.02[2] (cases cited within). Most cases that applied this test involved the alleged monopoly by a seller over a buyer. The government argued in its post-trial brief that the present case involves the reverse—the alleged monopoly by a buyer, Syufy, over the sellers, the distributors. Post–Trial Memorandum for the United States (hereinafter cited as "Post–Trial Memorandum"), filed Nov. 28, 1988, at 8. This situation, the government argues, warrants the use, not of the cross-elasticity-of-demand test, but rather the cross-elasticity-of-supply test to determine the relevant product market. In other words, in determining the relevant product market, the government believes the Court should analyze whether the distributors would treat sub-run exhibits, home video, cable television, and pay-per-view television as substitute channels of distribution if Syufy were to decrease the amount of money it paid for first-run exhibits.

The government cites *United States v. Rice Growers Ass'n of California*, 1986–2 Trade Cases (CCH) ¶ 67,288 at 61,459, 1986 WL 12562 (1986), as its sole support for the proposition that the Court should use only the test of cross elasticity of supply to define the relevant product market. *Rice Growers* was a merger case involving a violation of Section 7 of the Clayton Act. Judge Garcia considered whether California rice growers, the sellers, had good alternative purchasers for the rice they were selling to their current purchasers, the California mills. He found they did not and thus defined the product market as the purchase for milling of paddy rice grown in California. *Id.* at 61,463.

The government's argument and citation to *Rice Growers* is disingenuous. The situation presented to the Court in *Rice Growers* differs substantially from the situation in the present case. In this case, at trial,

the government argued that it was primarily concerned about the alleged anticompetitive effect on consumers of Syufy's acquisitions.[6] R.T. Vol. 8, at 1265–66. The effect on the distributors was simply an intermediate step before the alleged harm to the consumer was reached. *Id.* Now, after having had time to realize that the uncontroverted evidence introduced by Syufy at trial proved that consumers view the ancillary markets as substitutes to first-run exhibition, the government, in a post-trial brief, tries to argue that it is only concerned with the effect of Syufy's acquisitions on the distributors and not its effect on the consumers. Post–Trial Memorandum at 8. This argument attempts to remove the consumers views on substitutability from the Court's consideration of the relevant market. The government simply cannot have it both ways.

A review of case law indicates that the vast majority of antitrust cases have used cross elasticity of demand as the sole factor for determining the relevant product market. The Supreme Court, however, made reference to the use of what can only be termed "cross elasticity of supply" in *United States v. Columbia Steel Co.*, 334 U.S. 495, 510–11, 68 S.Ct. 1107, 1115–16, 92 L.Ed. 1533 (1948), as another possible factor in determining the relevant product market. This factor has been mentioned in only a handful of cases since *Columbia Steel* as one possible factor to be used in conjunction with cross elasticity of demand in analyzing the relevant product market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n. 42, 336, 82 S.Ct. 1502, 1524 n. 42, 1529, 8 L.Ed.2d 510 (1962); *United States v. Empire Gas Corp.*, 537 F.2d 296, 303 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir.1975);[7] *see also* Note, *Telex v. I.B.M.: Defining the Relevant Market*, 61 Iowa L.Rev. 184, 189, 219–21 (1975).

Thus, the Court must use cross elasticity of demand as the primary test to determine the relevant product market. The Court may also use cross elasticity of supply to supplement its use of cross elasticity of demand in analyzing the relevant product market. Whereas in this case the government has argued that Syufy's acquisitions have had an anticompetitive effect on the consumer and the distributor, use of both the cross-elasticity-of-demand and cross-elasticity-of-supply tests is appropriate to determine the relevant product market.

## B. *Cross Elasticity of Demand*

In analyzing cross elasticity of demand in this case, the Court must decide if consumers would choose to view motion pictures on home video, cable television, pay-per-

6. The government's lead trial attorney, Bernard Hollander, responding during closing argument to a question by the Court as to whose interest the government was protecting in this case, stated:

It's the long-time harm that we're talking about here, and while the immediate object of this—of this use of monopoly power is against the distributors, ultimately, as you heard Mr. Barlow testify, that down the road, if rentals are reduced, then quality and quantity of first-run films will ultimately be reduced; if they're ultimately reduced, clearly, the consumer will suffer from that in many—in many ways. But that is obviously—if there are fewer pictures produced of first run quality, the consumer is hurt.

So that my position is what I told you the other day, Your Honor, that we're—we're interested in preserving the public interest—representing the public interest to Your Honor, but there's a very clear step-by-step process by which you get to the consumer, even though its through the distributor.

R.T., Vol. 8, 1265–66.

7. In addition to the case law cited above, the 1984 Department *of Justice Merger Guidelines* list four factors as particularly important in deciding product substitutability for the purpose of defining relevant market. The first and fourth factors are relevant here.

The first factor is evidence of the buyers' perception that the products are substitutes, which is, in effect, cross elasticity of demand. The fourth factor is evidence of the sellers' perception that the products are substitutes, in effect, cross elasticity of supply. *1984 Merger Guidelines*, 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,-555.

The explanation to these factors indicates that, in determining relevant product market, one or a combination of more than one of these factors should be analyzed. *Id.*

view television, or as sub-run motion pictures rather than as first-run motion pictures if Syufy were to increase the prices it charged consumers for first-run pictures. The government introduced no evidence regarding whether consumers viewed these markets as substitutes. The evidence introduced by Syufy at trial—that consumers view these ancillary markets as substitutes to first-run exhibition—was conclusive and uncontroverted. The evidence proved that consumers not only would switch to the ancillary markets if a hypothetical price increase occurred, but that consumers already have switched to the ancillary markets for viewing motion pictures. In other words, consumers consider home video, cable television, sub-run exhibition, and, to a lesser degree, pay-per-view television viable substitutes to first-run theatrical exhibition. Thus, the Court finds that there is a very high cross elasticity of demand.

The specific evidence showed that 74.1 percent of the homes in Las Vegas have the capability of showing home video and 58.9 percent have cable television. Def. Exh. AZ. Both these percentages are higher than the national average. *Id.* Syufy introduced evidence that showed 50 percent of VCR owners attended theatre less often and 67 percent of VCR owners preferred to watch a movie at home instead of at a theatre. Def. Exh. BA. Evidence was introduced that persons who subscribe to pay cable also go to the movies less. Def. Exh. BC. In addition, Stuart N. Brotman testified, as an expert in the communications field, that the ancillary markets were viewed by consumers as substitutes to first-run exhibition. R.T., Vol. 7, 1074:18–21, 1077:5–8, 1082:3–9. Dr. Paul W. MacAvoy, Syufy's economic expert, testified that sub-run motion pictures were being played side-by-side at the same theatre and at the same price, and that the public could not effectively distinguish between first-run and sub-run. R.T. Vol. 6, 951:8–952:16. Finally, MacAvoy, Brotman, and Myhill all testified that the home video and cable television alternatives act as a restraint to theatre exhibitors' ability to charge excessive prices at the box office. R.T. Vol. 6, 952:17–953:18; Vol. 7, 1081–1082; Vol. 8, 1187–1190.

■ This uncontroverted evidence proves that if Syufy were to raise its prices, then many consumers would simply not go to one of its theatres to see a movie but would rent a movie on video or watch one on cable television. Thus, analyzing only the cross elasticity of demand, the relevant product market must include first-run exhibition of motion pictures, sub-run exhibition of motion pictures, and distribution of motion pictures to the ancillary markets of home video, cable television and pay-per-view television.

### C. *Cross Elasticity of Supply*

The Court now analyzes the cross elasticity of supply to determine if there is any basis to narrow the above-defined product market. As already mentioned, high cross elasticity of supply in this case would exist if Syufy were to decrease the price it is willing to pay distributors for motion pictures and, in response, the distributors were to forego releasing their pictures as first-run exhibition in Las Vegas and instead release their pictures in Las Vegas directly to home video, cable television, and pay-per-view television.

At trial, many representatives of the distributors who work directly in distributing pictures as first-run exhibition testified that they did not view the ancillary markets as substitutes for first-run exhibition.[8] Based on this testimony, the government argues that it is clear that distributors do not view the ancillary markets as substitutes. Post–Trial Memorandum at 7. The government's conclusion is a leap of faith. The government presented no testimony from anyone who worked for a distributor in any capacity other than distributing films for first-run exhibition. A distributor of motion pictures to home video or someone who supervises all the channels of distribution for the distributors might view the ancillary markets as substitutes.

**8.** R.T., Vol. 5, 734–35 (Mr. Spitz of Columbia Pictures); Vol. 2, 200–01 (Mr. Humak of Hemdale Distributors); Vol. 6, 937:38 (Mr. Barlow of Buena Vista Pictures).

Syufy presented substantial evidence to counter the government's evidence regarding cross elasticity of supply. Syufy's evidence indicates that there is a mild level of cross elasticity of supply between first-run exhibits and distribution to the ancillary markets. First, Brotman testified that of the 578 films produced in 1987, 214 were released on home video and not in the theatres. R.T., Vol. 7, 1065; Def. Exh. AP. The government implies that because none of these 214 motion pictures ever became blockbusters in the theatres, this evidence is not relevant. R.T., Vol. 8, 1272–73. The fact, however, that 214 out of 578 films produced in 1987 were released first or only on home video, regardless of whether they became blockbusters, indicates some cross elasticity of supply between these channels of distribution.

Second, Syufy presented evidence that distributors now make more money from the ancillary markets than from first-run exhibits of their motion pictures. Def. Exh. BD. In 1980, 76 percent of distributors' revenue came from theatrical exhibition. *Id.* Only 1 percent of distributors revenue was derived from home video. *Id.* Pay television and network television comprised the other 19 percent of the distributors' revenue for 1980. *Id.* The revenue mix changed drastically by 1987. In that year, the distributors derived only 42 percent of their revenue from theatrical exhibition. *Id.* On the other hand, the percentage of revenue derived from home video increased to 39 percent. *Id.* This is convincing evidence of the economic importance of the ancillary markets to the distributors. Because the ancillary markets are so economically important to the distributors, it can be reasonably inferred that some cross elasticity of supply exists between these forms of distribution.

The third fact Syufy presented at trial indicating cross elasticity of supply is that the "windows" [9] between first-run and sub-run release and between first-run release and the releases to the ancillary markets have blurred in recent years. There was uncontroverted testimony by Brotman that the once rigid delay between the release of motion pictures as first-run and sub-run and the release to theatres and home video has blurred so that currently there is no set delay between releases. R.T., Vol. 7, 1066–69. In fact, Brotman testified that the distributors look at all the channels of distribution—including distribution to the ancillary markets—when they make decisions regarding release dates for each particular film. R.T., Vol. 6, 1068–69. The time for release to home video is different for each film. In addition, no established window currently exists for sub-run release. R.T., Vol. 6, 1068–69. Sub-run exhibits can be any time after the initial release. *Id.* The blurring of the once rigid windows further convinces the Court that some cross elasticity of supply exists.

After weighing the conflicting evidence, the Court finds that a mild level of cross elasticity of supply exists between distribution of motion pictures as first-run and sub-run and distribution to the ancillary markets. Based on this mild level of cross elasticity of supply coupled with the extremely high level of cross elasticity of demand discussed above, the Court finds that sub-run exhibits as well as distribution to the ancillary markets of home video, cable television, and pay-per-view television must be included with first-run exhibits as the relevant product market in this case.

### III.

#### A. *Monopolization Under Section 2 of the Sherman Act*

To establish that Syufy has monopolized in violation of Section 2 of the Sherman Act, the government must prove that (1) Syufy possesses monopoly power in a relevant market, and (2) Syufy willfully acquired or maintained that power, rather than growing or developing as a consequence of a superior product or business acumen, or historic accident. *Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 492 (9th Cir.1977), *cert. denied*, 434

---

**9.** See section I, ¶ 6, *supra,* for definition of "windows."

U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

■ The government has totally failed to even address, let alone prove, that Syufy possesses monopoly power in the relevant product market of first-run exhibits, sub-run exhibits, and exhibits on home video, cable television, and pay-per-view television. Therefore, the Court finds for Syufy on the monopolization claim under Section 2 of the Sherman Act.

If the Court were to adopt, however, the government's antiquated definition of the relevant product market as including only first-run exhibits, the Court would still find the government did not prove that Syufy possesses monopoly power or that Syufy willfully acquired such power.

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *E.I. du Pont,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), *citing American Tobacco Co. v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). A high market share is evidence from which the existence of monopoly power may be inferred, but market share alone does not prove monopoly power.[10] *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Thus, the Court should look to market share as well as other factors that relate to Syufy's alleged power to control prices or exclude competition.

One of the factors that courts look to in deciding if monopoly power exists is the level of entry barriers for competition. *Syufy,* 793 F.2d at 995–96, 107. Judge Winter of the Second Circuit stated that,

where it can be ascertained that "entry into the relevant product and geographic market by new firms or existing firms ... is so easy that any anti-competitive impact of the merger ... would be eliminated more quickly by such competition than by litigation," a serious question exists as to the power to control prices or exclude competition. *United States v. Waste Management, Inc.,* 743 F.2d 976, 983 (2d Cir.1984). Furthermore, the government itself in its *Merger Guidelines* recognizes that ease of entry is a relevant factor in analyzing the impact of a merger upon competition, and that it may indeed be the most important factor.[11]

This case is a prime example of one in which no entry barriers in the Las Vegas market undermines any claim of monopoly power. The parties stipulated that Roberts expanded the number of theatres it operated between November 1985 and December 1986 from five to twenty-eight screens on the rapidly growing east side of Las Vegas. Pl. Findings, ¶ 65, at 13; Def. Counterfindings, ¶ 65, at 15. This expansion occurred during the same period in which the government would like the Court to believe that Syufy was exercising its greatest monopoly power. Furthermore, MacAvoy, Syufy's economic expert, testified convincingly that Roberts' great and rapid expansion is proof that no entry barriers existed or exist in Las Vegas. R.T., Vol. 6, 954–62. Moreover, Syufy's opening of another twelve screens shortly after trial is evidence that as of trial the Las Vegas market could handle additional screens. Finally, there was testimony that given Las Vegas' projected population growth and the rule of thumb in the industry that there should be one screen for every ten thousand persons,

---

**10.** The Ninth Circuit in *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), made clear that market share is not the only factor to analyze in assessing market power:

> Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition.

In addition, the Ninth Circuit in *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir 1975), *cert.*

*denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), observed that "it is now well settled that market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power."

**11.** The *Guidelines* state: "If entry into a market is so easy that existing competitors could not succeed in raising prices for any significant period of time, the Department is unlikely to challenge mergers in that market." 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,562.

Las Vegas in the near future will be under-screened. R.T., Vol. 7, 1102–04. Thus, the Court finds that additional competitors can enter the Las Vegas market with no barriers.

The government introduced evidence that Syufy had 84.1 percent of the gross box office receipts for first-run films that opened before November 1987. Pl. Exh. 3. The government also introduced evidence that between December 12, 1986, and November 6, 1987, Syufy had a 76 percent share of the gross box office receipts. Pl. Exh. 12. Roberts/United Artists during the same periods had 15.9 percent and 24 percent respectively. Pl. Exhs. 3, 12. Notwithstanding these percentages, the evidence adduced at the trial shows that Syufy did not possess monopoly power.

Syufy's high share of gross box office receipts during the period directly after it purchased the Red Rock Theatre was attributable to the superior quality of its theatres and management. Distributors testified that they usually preferred Syufy theatres because they were the best theatres in Las Vegas.[12] R.T., Vol. 1, 101–02; Vol. 2, at 209. Simply put, Syufy spent the money to either build or maintain its theatres as luxury theatres. This can be characterized only as procompetitive action that benefits the consumer.

On the other hand, Roberts/United Artists's lower market share was attributable to two major factors. First, Roberts built inferior theatres. Garganese himself, owner of Roberts, testified that he built "functional" theatres. R.T., Vol. 2, 301:19. No one stopped him from building luxury theatres to compete with Syufy. No one stopped United Artists from remodeling Roberts' theatres after it acquired them. As the largest exhibitor in the nation, it certainly has the resources to do so.

Second, Roberts/United Artists's market share is lower because they did not bid as aggressively as they might have. Allen Pinsker, the President of United Artists, testified that he did not want to "lose his shirt" so he did not bid as vigorously as he could for pictures.[13] R.T., Vol. 3, 378:23–24. Pinsker also testified that he wanted the distributors to give him better pictures. This would allow his theatres to attract larger audiences so that his theatres would become better grossing theatres. R.T., Vol. 3, 366. This expectation, however, is backwards because exhibitors should first operate first-rate theatres and, by doing so, entice distributors to license their better films to them.

By not wanting to remodel its theatres, by not wanting "to lose its shirt," and by wanting to be given the good films first without operating theatres as good as those operated by Syufy, United Artists has, in effect, declined to compete as vigorously as it could with Syufy.[14]

12. In fact, the government's first witness, Lawrence D. Gleason of the De Laurentiis Group, testified regarding Syufy: "They get the best pictures because they are the best theatres." R.T., Vol. 1, 101:17–18.

Robert J. Humak, in charge of distribution for Hemdale Film Corporation, testified as a witness for the government:

And I know the theatres, because I've seen all of Ray's theatres, they're gorgeous, and they gross great, and I know the new ones that he built are even going to be better. I know I want to play my films there. I can't speak for other distributors. In my opinion, I do not want to license my film to United Artists. I just don't.

R.T., Vol. 2, Trial Transcript, Vol. 2, 222:24–223:4.

13. In fact, United Artists did not bid at all on "Oliver & Company," one of the biggest pictures of the season. R.T., Vol. 3, 425.

14. The following cross-examination took place between Syufy's attorney, Maxwell M. Blecher, and Robert J. Humak, a distributor testifying for the government:

Q: And United Artists can fight back by putting up bigger guarantees, or remodeling its theatres or—or standing on its head to get you to play its pictures, can't they?
A: That is correct.
Q: And they are certainly not without the wherewithal to do that; are they?
A: That is correct.
Q: And they're the largest exhibitor in the United States?
A: That is correct.
Q: And if they want to fight back to Ray Syufy, they certainly aren't—don't have they're [sic] hands tied behind their back?
A: That is correct.
Q: And it's good for the consumers what [Syufy's] done over there, isn't it? Gives them another choice and another fine theatre to go to.

Analyzing the explanations for the market share percentages in conjunction with the total lack of entry barriers that existed and still exist in Las Vegas, the Court finds that, even if the Court were to define the market as consisting solely of first-run exhibits, Syufy does not possess monopoly power.

## B. *Attempted Monopolization Under Section 2 of the Sherman Act*

■ In order to establish that Syufy attempted to monopolize in violation of Section 2 of the Sherman Act, the government must prove that (1) Syufy had specific intent to control prices or destroy competition with respect to a part of commerce; (2) Syufy acted in a predatory or anticompetitive fashion directed to accomplishing the unlawful purpose; and (3) there was a dangerous probability of success.[15] *Transamerica Computer Co. v. IBM,* 698 F.2d 1377, 1382 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

The government relies on the comments of Myhill, Syufy's general manager, that one of the goals in acquiring the Red Rock Theatre was to reduce the level of "busted guarantees" that it paid to distributors as its evidence that Syufy had the specific intent to control prices or destroy competition. R.T., Vol. 8, 1212, 1215. The Court does not agree with the government's contention. No doubt, one of Syufy's goals in acquiring the Red Rock Theatre was to reduce the level of "busted guarantees" it paid distributors. That fact alone does not prove it had the specific intent to control prices or exclude competition. Many of the distributors who testified at trial stated that the level of the bidding in Las Vegas prior to the acquisition of the Red Rock Theatre was so high that it could not possibly continue and that everybody, including the distributors, would ultimately be harmed by it. R.T., Vol. 2, 211:9–213:6; R.T., Vol. 5, 707:23–709:11; Vol. 4, 661:24–662:13. Thus, Syufy's acquisition was not done with the specific intent to control prices, but rather to restore the market to a viable level of competition. And this is in fact what happened. After the acquisition, Roberts expanded the number of its theatres and United Artists entered the Las Vegas market. Viable healthy competition was restored.

The government contends that Syufy's acquisition of the Red Rock Theatre was a predatory act so as to satisfy the second element. Syufy showed, through MacAvoy's analysis of Syufy's income statement, that its operating costs per screen decreased after the mergers. MacAvoy concluded that the mergers created a more efficient operation for Syufy. The Court agrees. R.T., Vol. 6, 985–89. Furthermore, all the distributors testified that at all times after Syufy acquired the Red Rock Theatre, it paid a fair and reasonable film rental to the distributors. R.T., Vol. 5, 715:2–716:23; Vol. 2, 216:22–221:7; Vol. 6, 888:25–889:5; Vol. 6, at 924:2–12. No other evidence was introduced that even hinted at predatory action on Syufy's part.

Finally, the government has failed to come even close to showing that Syufy has or had a dangerous probability of success in monopolizing the market. First, the government failed to introduce any evidence that Syufy had a dangerous probability of success in monopolizing the relevant market consisting of first-run exhibits, sub-run exhibits, and exhibition on home video, cable television, and pay-per-view television. Second, even if the Court were to adopt the government's proposed relevant product market consisting of only first-run exhibits, the government still failed to

---

A: In my opinion, yes.
R.T., Vol. 2, at 224:6–21.

**15.** There is confusion in the Ninth Circuit regarding whether this third element—"dangerous probability of success"—is an element of attempted monopoly. *Compare Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474–75 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) ("dangerous probability of success" is not an element) with *Transamerica* *Computer Co. v. IBM,* 698 F.2d 1377, 1382 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983) (dangerous probability is an element), and *California Computer Products, Inc. v. IBM,* 613 F.2d 727, 735 (9th Cir.1979) (same). Because *Transamerica* and *California Computer Products* are later cases than *Lessig,* the Court will follow those cases and apply this third element.

prove a dangerous probability of success. In fact, the opposite was proved. Las Vegas has a good deal of competition for film licenses between United Artists and Syufy. More competition might exist if United Artists chose to compete vigorously for films, something which it has the resources to do, rather than expect to be given a free ride.

Therefore, the Court finds that the government failed to prove that Syufy attempted to monopolize under Section 2 of the Sherman Act.

## IV.

### *Section 7 of the Clayton Act*

To establish a violation of Section 7 of the Clayton Act, the government must prove that an acquisition is likely to substantially lessen competition, or to tend to create a monopoly in a relevant market. 15 U.S.C. § 18.

The government did not introduce one shred of evidence that showed that Syufy's acquisition of the Red Rock Theatre was likely to substantially lessen competition in the relevant product market of first-run exhibits, sub-run exhibits, and exhibition on home video, cable television, and pay-per-view television. Thus, the Court finds for Syufy on the Section 7 of the Clayton Act claim.

Furthermore, if the Court were to adopt the government's proposed product market definition consisting solely of first-run exhibits, the Court would still find, for the reasons outlined in great detail above, that Syufy's acquisition of the Red Rock Theatre did not pose a substantial likelihood of lessening competition in Las Vegas.

## V.

Based upon the testimony adduced at an eight-day bench trial, the seventy-one exhibits, depositions, and other documents contained in the record of this case, the Court has determined that the United States, failed to prove that Syufy monopolized or attempted to monopolize in violation of Section 2 of the Sherman Act, and failed to prove that Syufy's acquisition of the Red Rock Theatre would likely lessen substantially competition in Las Vegas in violation of Section 7 of the Clayton Act. Accordingly,

IT IS HEREBY ORDERED that:

1. The government's request for an injunction requiring Syufy to divest its Red Rock Theatre and either the Parkway Theatre or the Boulevard Theatre is denied.

2. The foregoing constitutes the findings of facts and conclusions of law required by Federal Rule of Civil Procedure 52.