UNITED STATES of America,
Plaintiff–Appellant,

v.

SYUFY ENTERPRISES; Raymond J.
Syufy, Defendants–Appellees.

No. 89–15475.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 14, 1989.

Decided May 9, 1990.

Robert B. Nicholson, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Maxwell M Blecher, Blecher & Collins, Los Angeles, Cal., for defendants-appellees.

Before WIGGINS and KOZINSKI, Circuit Judges, and QUACKENBUSH, District Judge.*

KOZINSKI, Circuit Judge:

Suspect that giant film distributors like Columbia, Paramount and Twentieth Century–Fox had fallen prey to Raymond Syufy, the canny operator of a chain of Las Vegas, Nevada, movie theatres, the United States Department of Justice brought this civil antitrust action to force Syufy to disgorge the theatres he had purchased in 1982–84 from his former competitors. The case is unusual in a number of respects: The Department of Justice concedes that moviegoers in Las Vegas suffered no direct injury as a result of the allegedly illegal transactions; nor does the record reflect complaints from Syufy's bought-out competitors, as the sales were made at fair prices and not precipitated by any monkey business; and the supposedly oppressed movie companies have weighed in on Syufy's side. The Justice Department nevertheless remains intent on rescuing this platoon of Goliaths from a single David.

After extensive discovery and an 8½ day trial, the learned district judge entered comprehensive findings of fact and conclusions of law, holding for Syufy. He found, inter alia, that Syufy's actions did not injure competition because there are no barriers to entry—others could and did enter the market—and that Syufy therefore did not have the power to control prices or exclude the competition. While Justice raises a multitude of issues in its appeal, these key findings of the district court present the greatest hurdle it must overcome.

## Facts

Gone are the days when a movie ticket cost a dime, popcorn a nickel and theatres had a single screen: This is the age of the multiplex. With more than 300 new films released every year—each potentially the next Batman or E.T.—many successful the-

* The Honorable Justin L. Quackenbush, United States District Judge for the Eastern District of Washington, sitting by designation.

atres today run a different film on each of their six, twelve or eighteen screens. The multiplex offers something for everyone: Moviegoers can choose from a wider selection of films; theatre operators are able to balance profits and losses from blockbusters and flops, and to reduce manpower by consolidating concession islands; the producers, of course, like having the extra screens on which to display their wares.

Raymond Syufy understood the formula well. In 1981, he entered the Las Vegas market with a splash by opening a six-screen theatre. Newly constructed and luxuriously furnished, it put existing facilities to shame. Syufy's entry into the Las Vegas market caused a stir, precipitating a titanic bidding war.[1] Soon, theatres in Las Vegas were paying some of the highest license fees in the nation, while distributors sat back and watched the easy money roll in.

It is the nature of free enterprise that fierce, no holds barred competition will drive out the least effective participants in the market, providing the most efficient allocation of productive resources. And so it was in the Las Vegas movie market in 1982. After a hard fought battle among several contenders, Syufy gained the upper hand. Two of his rivals, Mann Theatres and Plitt Theatres, saw their future as rocky and decided to sell out to Syufy. While Mann and Plitt are major exhibitors nationwide, neither had a large presence in Las Vegas. Mann operated two indoor theatres with a total of three screens; Plitt operated a single theatre with three screens. Things were relatively quiet until September 1984; in September, Syufy entered into earnest negotiations with Cragin Industries, his largest remaining competitor.[2] Cragin sold out to Syufy midway through October, leaving Roberts Company, a small exhibitor of mostly second-run films, as Syufy's only competitor for first-run films in Las Vegas.

It is these three transactions—Syufy's purchases of the Mann, Plitt and Cragin theatres—that the Justice Department claims amount to antitrust violations.[3] As government counsel explained at oral argument, the thrust of its case is that "you may not get monopoly power by buying out your competitors." Tr. of Oral Arg. at 1.

### Discussion

Competition is the driving force behind our free enterprise system. Unlike centrally planned economies, where decisions about production and allocation are made by government bureaucrats who ostensibly see the big picture and know to do the right thing, capitalism relies on decentralized planning—millions of producers and consumers making hundreds of millions of individual decisions each year—to determine what and how much will be produced.

---

1. Film distributors do not hand out prints for free; they sell exhibition licenses. These licenses normally specify a percentage of weekly house receipts, known as license fees, payable by the theatre owner to the distributor. Where more than one theatre in a given area volunteers to pay the license fee for a particular film, the distributor has several options: It can license the film to more than one theatre in the area; it can award the film to a particular theatre with which it has an ongoing relationship; or it can let them all bid for exclusive exhibition rights. Where the distributor adopts the competitive bidding approach, as virtually all distributors did in Las Vegas prior to October 1984, the high bid usually includes a guarantee—a minimum fee payable to the distributor even if the film bombs.

 As bidding in Las Vegas grew more fierce, guarantee amounts went over the top. Too often, the bids were so high that theatre owners ran up substantial losses. The industry refers to these as busted guarantees, meaning that because the film did less business than was expected, the theatre was trapped into paying the higher guarantee amount instead of the percentage of box office it had negotiated. Occasionally, guarantees in Las Vegas were so high that they exceeded the gate at a particular theatre.

2. Cragin's Redrock Theatre was an 11-screen multiplex. It was sold to Syufy when the enterprise fell upon hard times because of a dispute between partners Lucille Cragin and Horst Schmidt.

3. Specifically, the government's complaint alleges monopolization and/or attempted monopolization of a part of commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1988), and substantial lessening of competition by acquisition within a line of commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1988).

Competition plays the key role in this process: It imposes an essential discipline on producers and sellers of goods to provide the consumer with a better product at a lower cost; it drives out inefficient and marginal producers, releasing resources to higher-valued uses; it promotes diversity, giving consumers choices to fit a wide array of personal preferences; it avoids permanent concentrations of economic power, as even the largest firm can lose market share to a feistier and hungrier rival. If, as the metaphor goes, a market economy is governed by an invisible hand, competition is surely the brass knuckles by which it enforces its decisions.

■ When competition is impaired, producers may be able to reap monopoly profits, denying consumers many of the benefits of a free market. It is a simple but important truth, therefore, that our antitrust laws are designed to protect the integrity of the market system by assuring that competition reigns freely. While much has been said and written about the antitrust laws during the last century of their existence, ultimately the court must resolve a practical question in every monopolization case: Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time? Or, have barriers been erected to constrain the normal operation of the market, so that the problem is not likely to be self-correcting? In the latter situation, it might well be necessary for a court to correct the market imbalance; in the former, a court ought to exercise extreme caution because judicial intervention in a competitive situation can itself upset the balance of market forces, bringing about the very ills the antitrust laws were meant to prevent. *See* R. Coase, *The Firm, The Market, and the Law* 117–19 (1988); R. Posner, *Economic Analysis of Law* 324–25, 338–39 (3d ed. 1986).

It is with these observations in mind that we turn to the case before us. Perhaps the most remarkable aspect of this case is that the accused monopolist is a relatively tiny regional entrepreneur while the alleged victims are humongous national corporations with considerable market power of their own. While this is not dispositive—it is conceivable that a little big man may be able to exercise monopoly power locally against large national entities—chances are it is not without significance. Common sense suggests, and experience teaches, that monopoly power is far more easily exercised by larger, economically more powerful entities against smaller, economically punier ones, than vice versa.

■ Also of significance is the government's concession that Syufy was only a monopsonist, not a monopolist.[4] Thus, the government argues that Syufy had market power, but that it exercised this power only against its suppliers (film distributors), not against its consumers (moviegoers). This is consistent with the record, which demonstrates that Syufy always treated moviegoers fairly: The movie tickets, popcorn, nuts and the Seven-Ups cost about the same in Las Vegas as in other, comparable markets. While it is theoretically possible to have a middleman who is a monopolist upstream but not downstream, this is a somewhat counterintuitive scenario. Why, if he truly had significant market power, would Raymond Syufy have chosen to take advantage of the big movie distributors while giving a fair shake to ordinary people? And why do the distributors, the alleged victims of the monopolization scheme, think that Raymond Syufy is the best thing that ever happened to the Las Vegas movie market?

■ The answers to these questions are significant because, like all antitrust cases, this one must make economic sense. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 594 n. 19, 596–97, 106 S.Ct. 1348, 1356, 1360 n. 19, 1361–62, 89 L.Ed.2d 538 (1986). Keeping in mind that competition, not government in-

---

**4.** *Monopsony is defined as a "market situation in which there is a single buyer or a group of buyers making joint decisions. Monopsony and monopsony power are the equivalent on the* buying side of monopoly and monopoly power on the selling side." R. Lipsey, P. Steiner & D. Purvis, *Economics* 976 (7th ed. 1984).

tervention, is the touchstone of a healthy, vigorous economy, we proceed to examine whether the district court erred in concluding that Syufy does not, in fact, hold monopoly power. There is universal agreement that monopoly power is the power to exclude competition or control prices. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956); *Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 993 (9th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). The district court determined that Syufy possessed neither power. As the government's case stands or falls with these propositions, the parties have devoted much of their analysis to these findings. So do we.

1. Power to Exclude Competition

It is true, of course, that when Syufy acquired Mann's, Plitt's and Cragin's theatres he temporarily diminished the number of competitors in the Las Vegas first-run film market. But this does not necessarily indicate foul play; many legitimate market arrangements diminish the number of competitors. It would be odd if they did not, as the nature of competition is to make winners and losers.[5] If there are no significant barriers to entry, however, eliminating competitors will not enable the survivors to reap a monopoly profit; any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less. *See Metro Mobile CTS, Inc. v. New Vector Commun., Inc.*, 892 F.2d 62, 63 (9th Cir.1989).

Time after time, we have recognized this basic fact of economic life:

A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.

*Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) (citation omitted). *See also Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981) ("Blind reliance upon market share, divorced from commercial reality, [can] give a misleading picture of a firm's actual ability to control prices or exclude competition.").[6] There is nothing magic about this proposition; it is simple common sense, embodied in the Antitrust Division's own Merger Guidelines:

If entry into a market is so easy that existing competitors could not succeed in raising price for any significant period of time, the Department is unlikely to challenge mergers in that market.

Antitrust Policies and Guidelines, U.S. Dep't of Justice, Merger Guidelines § 3.3, reprinted in 4 Trade Reg. Rep. (CCH) ¶ 13,103 at 20,562 (1988).

The district court, after taking testimony from a dozen and a half witnesses and

---

**5.** *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 608e, at 20–21 (1978); L. Sullivan, *Handbook of the Law of Antitrust* § 34, at 96 (1977). Given this reality, it would be perverse to expect rivals engaged in head on competition to act like best friends; indeed, it would be cause for suspicion if they did.

**6.** We have previously held that a district court acts within the legitimate scope of its discretion in determining that evidence of a high market share establishes a prima facie antitrust violation, shifting to the defendant the burden of rebutting the prima facie violation. *See California v. American Stores Co.*, 872 F.2d 837, 842 (9th Cir.1989), reversed on other grounds, —— U.S. ——, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). The converse is not true, however; evidence of a high market share does not require a district court to conclude that there is an antitrust violation. In fact, such a conclusion normally should not be drawn where the evidence also indicates that there is no barrier to entry into the relevant market. *See Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); *accord American Stores*, 872 F.2d at 842 ("An absence of entry barriers into a market constrains anticompetitive conduct, irrespective of the market's degree of concentration."). The explanation is simple; where entry barriers are low, market share does not accurately reflect the party's market power. *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982–83 (2d Cir.1984).

examining innumerable graphs, charts, statistics and other exhibits, found that there were no barriers to entry in the Las Vegas movie market. Our function is narrow: we must determine whether that finding is clearly erroneous. *See Oahu Gas,* 838 F.2d at 363, 367. Our review of the record discloses that the district court's finding is amply supported by the record.

■ We bypass as surplusage the hundreds of pages of expert and lay testimony that support the district court's finding, and focus instead only on a single—to our minds conclusive—item. Immediately after Syufy bought out the last of his three competitors in October 1984, he was riding high, having captured 100% of the first-run film market in Las Vegas. But this utopia proved to be only a mirage. That same month, a major movie distributor, Orion, stopped doing business with Syufy, sending all of its first-run films to Roberts Company, a dark horse competitor previously relegated to the second-run market.[7] Roberts Company took this as an invitation to step into the major league and, against all odds, began giving Syufy serious competition in the first-run market. Fighting fire with fire, Roberts opened three multiplexes within a 13–month period, each having six or more screens. By December 1986, Roberts was operating 28 screens, trading places with Syufy, who had only 23. At the same time, Roberts was displaying a healthy portion of all first-run films. In fact, Roberts got exclusive exhibition rights to many of its films, meaning that Syufy could not show them at all.

By the end of 1987, Roberts was showing a larger percentage of first-run films than was the Redrock multiplex at the time Syufy bought it. Roberts then sold its theatres to United Artists, the largest theatre chain in the country, and Syufy continued losing ground. It all boils down to this: Syufy's acquisitions did not short circuit the operation of the natural market forces; Las Vegas' first-run film market was more competitive when this case came to trial than before Syufy bought out Mann, Plitt and Cragin.[8]

■ The Justice Department correctly points out that Syufy still has a large market share, but attributes far too much importance to this fact.[9] In evaluat-

---

**7.** Second-run films are the same as first-run films, only older. When a film is initially released for public exhibition, it is in its first run. Once public demand for the film has fallen off (but usually before it is reduced to a dead calm), the first-run theatre will ship it out to make room for something more recent. The film may then open elsewhere in the same area, usually at a lower ticket price, this being the film's second run.

**8.** The government argues that the district court's finding that "Roberts was a *successful* competitor of Syufy in Las Vegas," *United States v. Syufy Enters.,* 712 F.Supp. 1386, 1393 (N.D.Cal. 1989) (emphasis added), is clearly erroneous because it conflicts with a stipulation that "Roberts was not an *effective* competitor." *United States v. Syufy Enters.,* No. C–86–3057–WHO at 6 (N.D.Cal. Nov. 3, 1988) (Stipulated Facts) (emphasis added). We see no reason to resolve this semantic squabble. The stipulation on which the government relies goes on to state that "Roberts expanded its operation in Las Vegas from five screens in 1983 to 28 screens in 1987." *Id.* It is this fact that colors our conclusion, not the particular adjective selected by the parties or by the district court.

The stipulation—even if read as the government suggests—does not undermine the district court's separate findings that United Artists,

Roberts' successor, "competes vigorously with Syufy, a substantially smaller chain," that UA is "much more successful than was Roberts because of its substantial 'clout' with distributors," and that UA could, if it wished to, compete with Syufy even more vigorously. 712 F.Supp. at 1394. All of this amply supports the district court's determination that Syufy faces substantial competition.

**9.** The government also challenges the district court's definition of the relevant upstream product market in Las Vegas. The court defined the market broadly to include not only first-run theatrical exhibition, but also "exhibition on home video, cable television, and pay-per-view television." 712 F.Supp. at 1389. We agree with the government that this is not the proper market definition in examining Syufy's power over film distributors. While moviegoers may well view these alternative methods of film exhibition as readily substitutable, film distributors do not. Distributors use first-run theatrical exhibition to make sure that audiences are exposed to a film so that, even if it gets bad reviews and fails to turn a profit in theatres, people switching channels or checking out videos will recognize the title and be induced by its fame to watch it. That first-run theatrical exhibition enhances a film's performance in auxiliary markets does not mean that auxiliary mar-

ing monopoly power, it is not market share that counts, but the ability to *maintain* market share. *See Oahu Gas*, 838 F.2d at 366. Syufy seems unable to do this. In 1985, Syufy managed to lock up exclusive exhibition rights to 91% of all the first-run films in Las Vegas. By the first quarter of 1988, that percentage had fallen to 39%; United Artists had exclusive rights to another 25%, with the remaining 36% being played on both Syufy and UA screens.

▬▬▬▬ Syufy's share of box office receipts also dropped off, albeit less precipitously.[10] In 1985, Syufy raked in 93% of the gross box office from first-run films in Las Vegas. By the first quarter of 1988, that figure had fallen to 75%. The government insists that 75% is still a large number, and we are hardpressed to disagree; but that's not the point. The antitrust laws do not require that rivals compete in a dead heat, only that neither is unfairly kept from doing his personal best. Accordingly, the government would do better to plot these points on a graph and observe the pattern they form than to focus narrowly on Syufy's market share at a particular time. The numbers reveal that Roberts/UA has steadily been eating away at Syufy's market share: In two and a half years, Syufy's percentage of exclusive exhibition rights dropped 52% and its percentage of box office receipts dropped 18%. During the same period, Roberts/UA's newly opened theatres evolved from absolute beginners, barely staying alive, into a big business.[11]

▬▬▬ The government concedes that there are no structural barriers to entry into the market: Syufy does not operate a bank or similar enterprise where entry is

kets can substitute for theatrical release. The district court was therefore mistaken in relying on testimony that "of the 578 films produced in 1987, 214 were released on home video and not in the theatres," *id.* at 1400, as there was no suggestion that any of these 214 films were suitable for theatrical release, or that any film has ever been released first on home video and then later played in first-run theaters. Jane Fonda's Low Impact Aerobic Workout may be a best-selling videocassette, but it is unlikely to be the hit at a local movie theatre.

The district court's erroneous definition of the relevant upstream product market does not warrant reversal, however. The district court repeatedly made alternative findings using the government's narrower market definition limited solely to first-run exhibition. Our review of the record convinces us that these alternative findings are supported by substantial evidence.

10. The district court was entitled to rely on any of several indicia of Syufy's market share, including its percentage of first-run films, its percentage of first-run playdates and its percentage of gross box office receipts. As each of these indices points in the same direction—toward Syufy's decreasing market share—we fail to understand what the government hopes to gain by arguing that box office receipts are the only meaningful indicator of market share.

In any event, we are unable to agree with the government on this issue. By focusing exclusively on box office receipts, the government attributes to Syufy a prescience he does not possess. No one, not even Syufy, can accurately predict how every movie will do at the box office. As demonstrated by the large number of busted guarantees, exhibitors in Las Vegas often had great expectations for films that eventually disappeared without a trace. That does not necessarily mean that the films were bad or that the theatres that played them did not want them very much; it simply means that the exhibitor did not have perfect foresight. Thus, for example, the government stepped out of bounds in disparaging Powwow Highway. *See* Reply Brief for Appellant at 7–8 n. 7. While somewhat off beat, the film garnered terrific reviews and captured the Filmmakers Trophy at the Sundance United States Film Festival in Park City, Utah. LA Times, Jan. 31, 1989, at VI–7, col. 4. Film critic Sheila Benson described it as "a little zinger of a comedy with a rare backbone of intelligence"; "a pretty irresistible movie ... that fixes [itself] permanently in our affections." LA Times, March 17, 1989, at VI–1, col. 2, VI–16, col. 1. *See also* L. Maltin, *Leonard Maltin's TV Movies & Video Guide* 206 (1989). Reviews this good are not common; some theatre operators, seeing that a movie had become the critic's choice, might well be willing to go for the longshot rather than the sure thing.

11. The Antitrust Division's Merger Guidelines adopt a two-year test in determining whether there are barriers to entry in a market: if successful entry is likely within two years, there are no significant entry barriers, and the government will not challenge mergers in that market. Merger Guidelines § 3.3, reprinted in 4 Trade Reg. Rep. (CCH) ¶ 13,103 at 20,562 (1988). Had the government applied the two-year test here, it surely would not have pursued this suit against Syufy. The critical acquisition occurred in October 1984; by December 1986, Roberts had not only successfully entered the market, it was operating five more first-run screens than was Syufy.

limited by government regulation or licensing requirements. Nor is this the type of industry, like heavy manufacturing or mining, which requires onerous front-end investments that might deter competition from all but the hardiest and most financially secure investors.[12] *See* R. Posner, *supra* p. 663, at 290. Nor do we have here a business dependent on a scarce commodity, control over which might give the incumbent a substantial structural advantage. Nor is there a network of exclusive contracts or distribution arrangements designed to lock out potential competitors. To the contrary, the record discloses a rough-and-tumble industry, marked by easy market access, fluid relationships with distributors, an ample and continuous supply of product, and a healthy and growing demand.[13] It would be difficult to design a market less susceptible to monopolization.

Confronted with this record and the district court's clear findings, the government trots out a shopworn argument we had thought long abandoned: that efficient, aggressive competition is itself a structural barrier to entry. According to the government, competitors will be deterred from entering the market because they could not hope to turn a profit competing against Syufy. In the words of government counsel:

> There is no legal barrier. There is no law that says you can't come into this market, it's not that kind of barrier.... But, the fact of mere possibility in the literal sense, is not the appropriate test. Entry, after all, must, to be effective to dissipate the monopoly power that Syufy has, entry must hold some reasonable prospect of profitability for the entrant, or else the entrant will say, as Mann Theatres said ... this is not an attractive market to enter. There will be shelter. And the reason is very clear. You have marked by a rapidly expanding volume of demand and low barriers to entry." *Metro Mobile CTS, Inc. v. New Vector Commun., Inc.,* 892 F.2d 62, 63 (9th Cir.1989).

More fundamentally, the government's static model, which assumes that there is only so much demand for a particular product, is alien to modern economic theory, as well as common sense, which teach us that things change. The demand for movie tickets can fluctuate with a variety of factors such as price, quality of the movie theatre, cost of related goods such as concession stand products, and quality of films shown. Even assuming that the Las Vegas movie market was, in some static sense, operating at capacity, the entry of a new competitor might, as the district court found, simply result in "the exit of some of the less attractive and less efficient theatres in Las Vegas." 712 F.Supp. at 1396. Or, a new competitor with high hopes might price movie tickets lower, increase advertising, provide more convenient parking facilities, or otherwise induce people to go to the movies more often. Or, a theatre operator might hit the jackpot by catering to parents of small children who might be more likely to patronize drive-in theatres. We cannot and should not speculate as to the details of a potential competitor's performance; we need only determine whether there were barriers to the entry of new faces into the market. As we discuss in greater detail below, in making that determination we are not concerned with whether, once in the market, the competitor will wind up doing well. The thing to remember is that doing business in the crucible of free enterprise is inherently unpredictable.

---

**12.** The Justice Department argues that it is expensive to build a multiplex, but the district court was rightly unimpressed by this contention. Syufy was neither the first nor the last to open a multiplex in Las Vegas: Cragin's 11-screen Redrock was there before Syufy came into the market and, soon thereafter, Roberts opened three multiplexes in quick succession. In fact, Roberts was spared the expense of construction, as several of its theatres were financed by shopping center developers from whom Roberts later leased space. *See* RT 2:254–55, 2:261, 2:272–73, 2:278–79.

**13.** The Justice Department claims that the district court misunderstood the evidence on this point. It argues that Las Vegas is "over-screened," *i.e.,* that potential competitors declined to enter the market because there was not enough business to go around. The district court made detailed contrary findings: The rule of thumb in the film industry is that it takes 10,000 people to support one screen. Las Vegas is populated by approximately 600,000 residents and 100,000 tourists at any given time, leaving room for as many as 70 screens. Yet, at the time of trial, there were only 50 first-run screens in the city, meaning that the Las Vegas market offered ample opportunities to potential entrants. In addition, Las Vegas is a boom town, growing at the rate of 30,000 people a year. Thus, the potential for new entry into the first-run film market will continue. RT 2:300, 3:338, 6:989. "Because untapped potential provides a mouth-watering incentive for vigorous competition, it is axiomatic that monopoly power is unlikely to arise in dynamic industries

to compete effectively in this market. And witness after witness testified you would need to build anywhere from 12 to 24 theatres, which is a very expensive and time consuming proposition. *And, you would then find yourself in a bidding war against Syufy.*

Tr. of Oral Arg. at 5 (emphasis added).

▆ The notion that the supplier of a good or service can monopolize the market simply by being efficient reached high tide in the law 44 years ago in Judge Learned Hand's opinion in *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945).[14] In the intervening decades the wisdom of this notion has been questioned by just about everyone who has taken a close look at it. *See, e.g., MCI Commun. Corp. v. AT & T*, 708 F.2d 1081, 1107–08 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); 3 P. Areeda & D. Turner, *supra* n. 5, ¶ 608e, at 22 ("It is absurd to classify such behavior as unlawfully 'exclusionary.' "); L. Sullivan, *supra* n. 5, at 103 ("The Hand formulation ... fails to clearly identify the differences between guilty and innocent conduct."). It has been soundly repudiated by the Second Circuit. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273–74 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

The argument government counsel presses here is a close variant of *Alcoa:* The government is not claiming that Syufy monopolized the market by being too efficient, but that Syufy's effectiveness as a competitor creates a structural barrier to entry, rendering illicit Syufy's acquisition of its competitors' screens. We hasten to sever this new branch that the government has caused to sprout from the moribund *Alcoa* trunk.

▆ It can't be said often enough that the antitrust laws protect competition, *not* competitors. As we noted earlier, competition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits. When a producer is shielded from competition, he is likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal. This is the evil the antitrust laws are meant to avert. But when a producer deters competitors by supplying a better product at a lower price, when he eschews monopoly profits, when he operates his business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served, even if no actual competitors see fit to enter the market at a particular time. While the successful competitor should not be raised above the law, neither should he be held down by law.

▆ The Supreme Court has accordingly distanced itself from the *Alcoa* legacy, taking care to distinguish unlawful monopoly power from "growth or development as a consequence of a superior product, business acumen, or historic accident," *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), which is off limits to the enforcer of our antitrust laws. If a dominant

---

**14.** In *Alcoa*, Judge Hand concluded that defendant corporation violated the antitrust laws simply by making all the right moves, in particular, by filling the demand of which it was the creator:

> True, it stimulated demand and opened new uses for the metal, but not without making sure that it could supply what it had evoked.... "Alcoa" avows it as evidence of the skill, energy and initiative with which it has always conducted its business; as a reason why, having won its way by fair means, it should be commended, and not dismembered.... [W]e may assume that all it claims for itself is true.... [But i]t was not inev-

itable that it should always anticipate increases in the demand for ingot and be prepared to supply them. Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel.... That was to "monopolize" that market, however innocently it otherwise proceeded.

148 F.2d at 430–32.

supplier acts consistent with a competitive market—out of fear perhaps that potential competitors are ready and able to step in—the purpose of the antitrust laws is amply served. We make it clear today, if it was not before, that an efficient, vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating. Fostering an environment where businesses fight it out using the weapon of efficiency and consumer goodwill is what the antitrust laws are meant to champion. As the Second Circuit has said: "We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition." *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir.1984).

But we need not rely on theory alone in rejecting the government's argument. The record here conclusively demonstrates that neither acquiring the screens of his competitors nor working hard at better serving the public gave Syufy deliverance from competition. Immediately following the disappearance of Mann, Plitt and Cragin, Roberts took up the challenge, aggressively competing with Syufy for first-run films—and with considerable success. United Artists, with substantial resources at its disposal and nationwide experience in running movie theatres, considered the market sufficiently open that it bought out Roberts in 1987. We see no indication that competition suffered in the Las Vegas movie market as a result of Syufy's challenged acquisitions.[15] The district court certainly had ample basis in the record for its finding that Syufy lacked the power to exclude competitors. Indeed, on this voluminous record we are hard-pressed to see how the

district court could have come to the other conclusion.

## 2. Power to Control Prices

The crux of the Justice Department's case is that Syufy, top gun in the Las Vegas movie market, had the power to push around Hollywood's biggest players, dictating to them what prices they could charge for their movies. The district court found otherwise. This finding too has substantial support in the record.

Perhaps the most telling evidence of Syufy's inability to set prices came from movie distributors, Syufy's supposed victims. At the trial, distributors uniformly proclaimed their satisfaction with the way the Las Vegas first-run film market operates; none complained about the license fees paid by Syufy. Columbia's President of Domestic Distribution testified that "Syufy paid a fair amount of film rental" that compared favorably with other markets. RT 5:715. A representative of Buena Vista, a division of Disney, testified that Syufy had never refused to accept its standard terms. RT 6:924. Particularly damaging to the government's case was the testimony of the former head of distribution for MGM/UA that his company "never had any difficulty ... in acquiring the terms that we thought were reasonable," RT 6:888, explaining that the license fees Syufy paid "were comparable or better than any place in the United States. And in most cases better." RT 6:911. Indeed, few if any of the distributors were willing to say anything to support the government's claim.

The documentary evidence bears out this testimony. Syufy has at all times paid

---

**15.** The government points out that the interiors of United Artists' theatres were not as luxurious as those of Syufy. We have no clue what sinister inference the government would have us draw from this fact. As the district court noted, "No one stopped United Artists from remodeling Roberts' theatres after it acquired them. As the largest exhibitor in the nation, it certainly has the resources to do so." 712 F.Supp. at 1402. Competitors need not provide a perfectly undifferentiated product in order to be competitive; it is a strength of our free market economy that competitors often provide products that cater to

the varied tastes and preferences of consumers. Syufy made a business decision to invest in luxury theatres while Roberts and United Artists apparently decided to dispose of their profits in some other fashions. It remains to be seen which strategy will ultimately prevail. Indeed, it is not a winner take all situation; in a free market, any number can play and any number can win. We therefore agree with the district court's refusal to conclude that this difference in business strategies was an indication of market failure.

license fees far in excess of the national average, even higher than those paid by exhibitors in Los Angeles, the Mecca of Moviedom. In fact, Syufy paid a higher percentage of his gross receipts to distributors in 1987 and 1988 than he did during the intensely competitive period just before he acquired Cragin's Redrock.[16]

While successful, Syufy is in no position to put the squeeze on distributors. The one time he tried there was an immediate backlash. In 1984, about seven days after allegedly acquiring its monopoly, Syufy informed Orion Releasing Group that he had cold feet about The Cotton Club and would not honor the large guarantees he had contracted for, only to see his gambit backfire. Orion sued Syufy for breach of contract, see *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946 (9th Cir.1987), licensed the film to Roberts and cut Syufy off cold turkey. To this day, Orion refuses to play its films in any Syufy theatre, in Las Vegas or elsewhere. 712 F.Supp. at 1393. Accordingly, Syufy lost the opportunity to exhibit top moneymakers like Robocop, Platoon, Hannah and Her Sisters and No Way Out.[17] The district court found no evidence that Orion considered Roberts/UA's theatres a less than adequate substitute for Syufy's. *Id.*

Because he needs plenty of first-run films to fill his many screens (22 at the time of trial; 34 now), Syufy is vulnerable. Distributors like Orion have substantial leverage over Syufy and they know it. One witness, the President of Domestic Distribution for Columbia, testified at length about the power he and other distributors wield over Syufy:

> ... [W]ith Syufy having 23 first-run screens, he could not get into a two and a half percent fight with Columbia; he had so many mouths to feed in those the-

atres, that he was more or less compelled to pay national suggested terms for films.

> . . . .

> ... He could have tried [to dictate terms], but he wouldn't have gotten away with it, your Honor. He was very vulnerable. My point is that he was very vulnerable in that market. He could not—he needed the flow of product to fill those screens, and to take on—to get into a fight with the distributor over terms, or film rentals paid to a distributor, would create an attitude where we could sell [to] his opposition and he'd be egregiously hurt.

> . . . .

> ... [H]e was his own competition, your Honor. He had created such a large amount of screens that he was—he was himself—he was himself vulnerable. As I described before, if he would have pressed, and if he would have come to Jimmie Spitz and said, "I'm not going to pay you this percentage for the film," I would have said, "Fine, Ray, we'll stay out of the marketplace." He couldn't afford—he has to—he has to have film in his theatres. And that's the leverage that this company had with Mr. Syufy.

RT 5:714–16 (testimony of James Spitz).

After hours of such testimony, the judge quite rightly concluded that Syufy did not have the power to control license fees. This evidence, moreover, reveals the trap in the oftmade assumption that, by virtue of being a leviathan, a company will automatically have the power to wield a big stick with which to push around suppliers, customers and competitors. While size no doubt provides significant business advantages, it can also have very substantial

---

**16.** The government argues that the district court erred in finding this earlier level of competition to be "unhealthy." 712 F.Supp. at 1394. While we agree, we need not reverse because of the insignificance of the error. The erroneous finding was relevant to only one of three elements needed to prove the government's attempted monopolization claim. As the government was unable to demonstrate that Syufy had the power to control prices or to exclude competition, it cannot prevail even though we disregard the

district court's finding of unhealthy competition.

**17.** The list of Orion films that played exclusively at Roberts theaters also includes such popular fare as Amadeus, Back to School, Bull Durham, Colors, Hoosiers, Married to the Mob, Radio Days and the unforgettable Throw Momma From the Train.

drawbacks, such as increased management costs and other diseconomies of scale.[18]

More fundamentally, in a free economy the market itself imposes a tough enough discipline on all market actors, large and small. Every supplier of goods and services is integrated into an endless chain of supply and demand relationships, making it dependent on the efficiency and goodwill of upstream suppliers, as well as the patronage of customers. Absent structural constraints that keep competition from performing its levelling function, few businesses can dictate terms to customers or suppliers with impunity. It's risky business even to try. As Syufy learned in dealing with Orion and his other suppliers, a larger company often is more vulnerable to a squeeze play than a smaller one. It is for that reason that neither size nor market share alone suffice to establish a monopoly. Without the power to exclude competition, large companies that try to throw their weight around may find themselves sitting ducks for leaner, hungrier competitors.

Or, as Syufy saw, the tactic may boomerang, causing big trouble with suppliers.

On this record, we have no basis for overturning the district court's finding that Syufy lacked the power to set the prices he paid his suppliers. As with the district court's finding as to Syufy's power to exclude competition, we believe the record here lent itself to only one sensible conclusion.[19]

### 3. Additional Considerations

Undeterred by the district court's carefully crafted 45 page opinion, the government sets out a variety of other contentions.[20] We have dealt with the principal ones during the course of our discussion and the rest are largely beside the point. By finding that Syufy did not possess the power to set prices or to exclude competition, the district court removed the firing pins from the government's litigation arsenal. Without these essential elements, it can make out a violation of neither the Sherman nor Clayton Acts; its lawsuit collapses like a house of cards.[21]

---

**18.** *See generally* A. Alchian & W. Allen, *University Economics* 270, 301 (1964); 2 P. Areeda & D. Turner, *supra* n. 5, § 407b, at 286–87; R. Posner, *supra* p. 663, at 318 n. 2, 368. In business, as elsewhere in life, it is sometimes true that the bigger they are, the harder they fall.

**19.** The Justice Department throws out a volley of numbers which, it claims, show that Syufy managed to depress license fees after buying out his competitors. The government attributes the lower fees to the exercise of monopoly power, but it is mistaken. The percentage of box office receipts paid to movie distributors rises and falls due to a combination of factors; it is not an accurate measure of the competitiveness of the market.

 For example, in 1985, Syufy paid Universal a very low license fee (48.1%). The fact is, however, Syufy paid more money to Universal that year than in any other from 1983 to 1988. The percentage only looks low because, in 1985, Universal released the hugely successful Back to the Future. The film played in Syufy's first-run theatres for more than six months; the longer a film's run, the lower the percentage of gross receipts payable to the distributor. Thus, the low percentage rate was based on factors other than monopoly power, as the district court quite reasonably found. Support is missing in the record for the Justice Department's theory of a shakedown by a ruthless predator.

**20.** Among them are the following: (1) the district court misdefined the relevant market; (2) the court did not understand that this was a monopsony case; (3) the court erred in looking beyond Syufy's large market share; (4) the court mistakenly looked at the number of first-run movies shown as indicative of market share; (5) the court was wrong to call the preacquisition level of competition "unhealthy"; (6) aggressive competition is itself a barrier to entry; (7) Las Vegas is "overscreened"; and (8) Roberts/United Artists' theatres are not as luxurious as Syufy's.

**21.** Absent any power to exclude competition, the government cannot prevail on its claim of monopolization under Section 2 of the Sherman Act, as that requires a showing that Syufy possesses monopoly power. Similarly, the attempted monopolization claim fails because the government cannot show that there was a dangerous probability that Syufy would succeed in destroying competition. Finally, the lack of entry barriers prevents the government from prevailing on its Clayton Act claim, as Syufy's acquisition of its competitors was not likely to substantially lessen competition.

 In his concurrence, Judge Quackenbush complains that our focus on the lack of entry barriers is too narrow; he lists other factors that ought to be considered. Concurrence at 673. While we agree that these other factors are relevant, as explained in the preceding paragraph, the total lack of entry barriers in Las Vegas determines the outcome of these factors

■ It is a tribute to the state of competition in America that the Antitrust Division of the Department of Justice has found no worthier target than this paper tiger on which to expend limited taxpayer resources.[22] Yet we cannot help but wonder whether bringing a lawsuit like this, and pursuing it doggedly through 27 months of pretrial proceedings, about two weeks of trial and now the full distance on appeal, really serves the interests of free competition.

The record here demonstrates in graphic detail that Syufy's entry into the Las Vegas first-run movie market resulted in a vast improvement for movie distributors and consumers alike. By all accounts, Raymond Syufy's theatres are among the finest built and best run in the nation, making him somewhat of a local hero. At the same time, movie distributors have nothing but praise for Syufy, as his being there has invigorated theatre attendance in Las Vegas, substantially driving up their revenues. As is often the case when a vigorous competitor enters the market, more complacent theatre operators were eliminated, but there was no credible evidence that Syufy did anything improper to drive them out. 712 F.Supp. at 1390–91. Indeed, by buying them out, Syufy may well have helped cushion the losses they would have suffered had they been required to sell the theatres at fire sale prices or leave them abandoned.

What then was the problem the government sought to solve by bringing this lawsuit? At oral argument, the lawyer for the government explained it thus:

[B]asically if you drive down by anti-competitive conduct the price at which theatre owners buy film licenses, then there will be less film[s] ultimately produced, because there will be a distortion in the natural market in the competitive forces, and people who go to movies like you and me would ultimately have less choice.

Tr. of Oral Arg. at 9. It is, we suppose, not out of the question that what Raymond Syufy and other local theatre operators do in their respective markets could stem the avalanche of movies that comes to us out of Hollywood every year. Yet movie distributors are not exactly a powerless lot, likely to surrender the first time they are presented with hard choices by a theatre operator; nor are they reluctant to precipitate a showdown when they believe their rights are being infringed.[23] And, as we have seen, the market has its own failsafe mechanisms. Where the government in-

in this case: Because others easily could (and did) enter the market successfully, Syufy lacked "the ability to maintain [market] share, the power to control prices, [and] the capability of excluding competitors." Id.

Judge Quackenbush suggests that, under our holding, no one having "less than 100 percent of market share" could ever have a monopoly "since the existence of competitors in the market would apparently establish the lack of barriers to entry." Concurrence at 674. We respectfully disagree. Entry barriers pertain not to those already in the market, but to those who would enter but are prevented from doing so. See Merger Guidelines § 3.3, reprinted in 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20,562 (1988) (focusing on difficulty of "entry into a market"). Thus, a market containing two firms, each having a 50% share, could well be deemed monopolistic if entry barriers prevented other firms from gaining a foothold.

22. The concurrence disputes our benign characterization of Syufy, relying largely on his conduct in another market. Concurrence at 674. As a general matter, we do not agree with this logic. Antitrust violations must be judged on a market-by-market basis. That Syufy may have been guilty of some impropriety in the past would not justify the government's decision to pursue a drawn-out legal battle as to his conduct in Las Vegas unless there was substantial evidence of wrongdoing in Las Vegas.

In any event, Syufy Enters. v. American Multicinema, Inc., 793 F.2d 990 (9th Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987), on which Judge Quackenbush relies, does not support his point; rather, it supports ours. In American Multicinema, we reversed an antitrust jury verdict against Syufy for insufficient evidence. See 793 F.2d at 1001–03. Given the infrequency with which we reverse jury verdicts, the Antitrust Division might have considered this, if at all, as a sign that Syufy was not the evildoer he was made out to be.

23. See, e.g., Columbia Pictures Indus. v. Professional Real Estate Investors, Inc., 866 F.2d 278 (9th Cir.1989), Orion Pictures Distrib. Corp. v. Syufy Enters., 829 F.2d 946 (9th Cir.1987); Twentieth Century–Fox Film Corp. v. MCA, Inc., 715 F.2d 1327 (9th Cir.1983), Paramount Pictures Corp. v. Thompson Theatres, Inc., 621 F.2d 1088 (10th Cir.1980).

serts an antitrust enforcement action into this type of situation, there is a real danger of stifling competition and creativity in the marketplace.

 It is well known that some of the most insuperable barriers in the great race of competition are the result of government regulation. Regulation often helps entrench existing businesses by placing new entrants at a competitive disadvantage. It is perhaps less well appreciated that litigation itself can be a form of regulation; lawsuits brought by the government impose significant costs on enterprises that are sued, and create significant disincentives for those that are not.

 In this case, the government was suspicious because Syufy bought out the movie theatres of his retreating competitors. But, in a competitive market, buying out competitors is not merely permissible, it contributes to market stability and promotes the efficient allocation of resources. The fact is, a relentless, growing competitor is frequently the most logical buyer of a business that is declining. For competitors in a free market to fear buying each other out lest they be hit with the expense and misery of an antitrust enforcement action amounts to a burden only slightly less palpable than a direct governmental prohibition against such a purchase.[24] In a free enterprise system decisions such as these should be made by market actors responding to market forces, not by government bureaucrats pursuing their notions of how the market should operate. Personal initiative, not government control, is the fountainhead of progress in a capitalist economy.

### Conclusion

The judgment of the district court is affirmed.

QUACKENBUSH, District Judge, concurring:

I concur in the result reached in Parts 1 and 2 of the opinion since I agree that the district court's findings were supported by the record and were not clearly erroneous. I further agree that the district court did not err in its conclusion that Syufy did not have monopoly power over the first-run movie distributors.

I do not agree with those portions of Parts 1 and 2 which state that if there are no significant barriers to entry, there can be no monopoly as a matter of law. I believe that the issue of barriers to entry is just one of the factors which should be considered by the court in determining whether monopoly power exists.

The offense of monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). In the instant case, there is no contention that Syufy did not willfully acquire 100 percent of the first-run movie market in Las Vegas in 1985. Syufy clearly accomplished that position by the purchase of its competitors.

If the opinion stands for the proposition that a finding of lack of barriers to entry *mandates* a finding of lack of monopoly power, then I disagree with the opinion. While I agree that the issue of monopoly power often depends heavily upon market share and barriers to entry, the analysis should also include consideration of the extent of the alleged monopolist's market share, the ability to maintain that share, the power to control prices, the capability

---

**24.** We are aware, of course, that even in a monopoly situation competitors may buy each other out where the selling company is failing. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 507, 94 S.Ct. 1186, 1198, 39 L.Ed.2d 530 (1974); *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 817–18 (2d Cir.1979). But establishing a failing company defense is not easy; a competitor must be in critical condition to be subject to acquisition under that doctrine. In a competitive market, however, there is no need to rely on a failing company defense, and the ability to buy out competitors who are merely ailing may well promote market efficiency, enhance consumer welfare and foster competition.

of excluding competitors, and the intent of the alleged monopolist, along with the existence of barriers to entry. *Oahu Gas Serv., Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 366 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).

If lack of barriers to entry precluded a finding of monopoly power, then the existence of less than 100 percent of market share would seem to preclude a finding of a monopoly, regardless of other factors, since the existence of competitors in the market would apparently establish the lack of barriers to entry. I do not believe this to be the proper interpretation of Section 2 of the Sherman Act, nor has the Supreme Court so interpreted monopoly power.

If absence of barriers to entry mandated a finding of lack of monopoly, the United States Supreme Court could not have held, as it did, that Standard Oil Company of New Jersey and John D. Rockefeller and their associates, with between 50 percent and 90 percent of the petroleum business, were monopolists, since there was no finding of barriers to entry and others were in competition in the petroleum business. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Likewise, if absence of barriers to entry required a finding of lack of monopoly power, the Supreme Court could not have held, as it did, in *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), that the merger of Proctor & Gamble with Clorox would violate the laws prohibiting monopolies where the merged company would have control of 65 percent of the country's sales of liquid bleach, since there were many other existing competitors in the liquid bleach market.

I do not believe that Congress intended to isolate a business or industry from the strictures of § 2 of the Sherman Act solely because there are no barriers to entry. All relevant factors should be considered in the monopoly determination. If Congress intended to except markets from scrutiny solely by reason of absence of barriers to entry, it would have done so. "[W]here exceptions are made, Congress should make them." *United States v. Line Material Co.*, 333 U.S. 287, 310, 68 S.Ct. 550, 92 L.Ed. 701 (1948).

I am unable to concur in Part 3 of the opinion which takes the Justice Department to task for the expenditure of government funds and the initiation of this action against an alleged "paper tiger." I do not agree that Syufy was a "paper tiger" or that there was not a reasonable basis for the initiation of this action.

In 1985, shortly before the commencement of this case, Syufy had completed the acquisition of all of its first-run theatre competitors. Syufy's final acquisition was of the 11–screen Red Rock theatres for which he paid $4,850,000 in cash, giving him ownership of all first-run theatres in Las Vegas. In 1985, Syufy had over 93 percent of the total box office receipts from first-run films. The only reason Syufy did not have 100 percent of the market was because of a dispute which arose between Syufy and Orion Pictures when Syufy, 7 days after acquiring Red Rock theatres, cancelled guarantees he had previously made to Orion.

The foregoing circumstances appear to have warranted the Antitrust Division in initiating this action. Syufy's prior actions belied a conclusion that it was a completely innocent party. Not only had Syufy spent large amounts of money to buy up all of its competitors in the first-run theatre business in Las Vegas, but it had a track record of monopolization, having been found, shortly before the commencement of this action, to have monopolized the exhibition of major feature films in the San Jose area. *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir.), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). While I concur in the opinion that Judge Orrick's decision in this case was not erroneous, I do not concur in Part 3 of the opinion.[1]

---

**1.** In Part 3 of the opinion, the majority, in footnote 21, construes my citation of a prior

case involving Syufy Enterprises, in which Syufy was found to be a monopolist, as a suggestion on my part that such a finding of prior monopolistic action, in and of itself, justified the initiation of this action. That was not my intent. The citation of the case in question, *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir.1986), was for the purpose of demonstrating that Syufy, who spent almost 5 million dollars in cash in purchasing all of his competitors, was not a "paper tiger" as suggested by the majority.

In footnote 22, the majority also contends that the finding of monopolistic actions by Syufy in the San Jose major feature films market was reversed by the Ninth Circuit in *American Multicinema* for insufficient evidence. To the contrary, this jury finding was found to have been supported by substantial evidence. At page 996 of *American Multicinema*, the court stated: "In conclusion, we hold that there is substantial evidence to support a jury verdict in favor of AMC on its first Section 2 monopolization theory; that Syufy monopolized the market for the exhibition of industry anticipated top-grossing films in the San Jose area."